**JOHNSON SERVICE COMPANY,**
**Plaintiff-Appellee,**

v.

**TRANSAMERICA INSURANCE COMPANY et al., Defendants-Appellants.**

**No. 73–1108.**

United States Court of Appeals,
Fifth Circuit.

Oct. 5, 1973.

James R. Harris, Corpus Christi, Tex., for defendants-appellants.

J. M. Burnett, Corpus Christi, Tex., for plaintiff-appellee.

Before GOLDBERG, CLARK and RONEY, Circuit Judges.

GOLDBERG, Circuit Judge:

In this diversity case defendants, Transamerica Insurance Company and Penner-Ring Co.,[1] appeal from the decision of the district court for the Southern District of Texas, 349 F.Supp. 1220, awarding plaintiff, Johnson Service Company, payment on a labor and material bond furnished to the United States. Finding defendants' contentions of error below unsupported by both the facts and the applicable Texas law, we affirm.

## THE FACTS

On March 29, 1968, the Post Office Department, acting pursuant to 39 U.S. C. § 2103 et seq., publicly solicited bids for the construction and subsequent leasing to the Government of a post office building in Corpus Christi, Texas. Under the terms of the Department's advertisement, the Government agreed to convey the post office site to the successful bidder by quitclaim deed. The facility was then to be leased back to the Government for a term of 30 years, with eight 5 year renewal options. Defendant Penner-Ring submitted a bid in the form of a lease-back agreement. The bid was accepted on June 24, 1968; and, shortly thereafter, Penner-Ring executed and submitted to the Government a performance bond in the penal sum of $1,556,800 and a labor and material bond in the penal sum of $622,720 (hereinafter the "Transamerica bond"). Penner-Ring was principal on each of these bonds, the United States was obligee, and defendant Transamerica Insurance Company was designated surety. The bonds were given in accordance with the specifications of paragraph 10 of the original advertisement for bids and paragraph 1A of the agreement to lease.

Subsequently, Penner-Ring entered into a contract with Braselton Construction Company of Corpus Christi for the actual construction of the building. As part of this contractual arrangement, Braselton agreed:

"to furnish at Contractor's expense a properly executed performance and completion bond and labor and materi-

---

1. Penner-Ring Company is a partnership composed of Joseph Penner, Seldon Ring, and Ellis Ring. Each of these parties is individually joined as a defendant.

al payment bond . . . running in favor of Owner [Penner-Ring] and any party or parties designated by Owner."

In fulfillment of this obligation Braselton executed in October, 1968, a payment bond provided under Texas law by the Hardeman Act, Article 5472d, Vernon's Ann.Tex.Civ.St. (hereinafter the "Hardeman Act bond").

Braselton chose Godbe Mechanical Contractors as a major sub-contractor on the Corpus Christi project. Godbe, in turn, contracted with plaintiff, Johnson Service Company, for the installation of a "complete workable temperature control system" for the building. Plaintiff fulfilled its part of the bargain. Godbe, unfortunately for all concerned, did not. It was unable to make payment for the labor and materials furnished by plaintiff and a number of other sub-contractors.

The Post Office Department accepted the building in November, 1969, and began its occupancy the following month. On April 2, 1970, plaintiff, acting pursuant to the ninety day notice requirement of the Transamerica bond, informed defendants, as principal and surety, that there was still $26,650 owing to it for labor and material furnished Godbe. On May 27, 1970, plaintiff filed the action under review here in federal district court seeking recovery on the Transamerica labor and material bond. During the period of pre-trial discovery in the federal suit, plaintiff filed, on March 3, 1971, a petition in the 105th District Court of Nueces County, Texas, attempting to recover on the Hardeman Act bond. The state court suit proceeded more speedily than the instant case, and plaintiff received partial recompense in that litigation on November 15, 1971 [2]. The remainder of the monies owed plaintiff by Godbe, some $21,790, was awarded by the federal district court in its judgment entered August 2, 1972.

In attacking this subsequent federal decision, defendants raise five points, which we will treat seriatim: (1) when a Hardeman Act bond has been provided, Texas law precludes recovery against or involving the owner in any way other than by suit on that bond; (2) by proceeding to judgment in the state suit, plaintiff made an election of remedies under Texas law and cannot recover on a second bond; (3) the Transamerica bond was to be available only in the event of a Government takeover of the project; (4) plaintiff did not comply with the ninety day notice provision of the Transamerica bond; and (5) plaintiff is barred by the Texas doctrine of judicial estoppel from showing timely notice.

## I. THE HARDEMAN ACT

In 1961 the Texas legislature extensively amended the Mechanics' and Materialmen's Lien Act [3], creating what is popularly known as the Hardeman Act. Among the many changes made was the addition of Article 5472d. This new statute provides for the filing of a bond by the prime contractor on a construction site, which bond will then stand in lieu of any liens on the property that would otherwise be available under Texas law to sub-contractors who had furnished labor or materials for the project. Such a payment bond has long been *required* in Texas of any prime contractor involved in building for the State or its agencies. See Article 5160, V.A.T.S. Through suits on the bond, rather than through the perfection of liens on public facilities, materialmen are protected, work on state projects is made attractive and secure, and the State is guaranteed unencumbered occupancy and use of essential projects.

---

2. Relief was limited in the state court proceeding to recovery for labor and material provided after October 1, 1969. The state court found that plaintiff was barred from additional recovery on that bond by its failure to comply with the notice requirements of the Hardeman Act, Article 5472d(4), V. A.T.S.

3. Articles 5452 et seq., V.A.T.S.

Article 5472d extended this regime from the public into the private sector. For the protection of materialmen, definite standards were established in the form, filing, and amount of these private construction bonds. See Article 5472d(1)–(3). For the protection of prime contractors and their sureties, detailed and highly technical notice requirements were promulgated. See Article 5472d(4). For the protection of owners, persons in the position of defendant Penner-Ring, the legislature provided Section 7 of the new act.

> "In all cases where bonds have been filed in accordance with this Article, no suits shall be filed against the owner nor against his property, and any purchaser, lender or other person acquiring any interest in said property shall be entitled to rely upon the record of such bond and contract on file as constituting payment of all claims and liens for labor, or subcontracts, or materials or specially fabricated materials, as if he were the owner who approved, accepted and endorsed the bond; and the owner shall be relieved of all obligations under Articles 5454, 5463 and 5469 hereof. If the valid claims against a bond are in excess of the penal sum of the bond, each claimant shall be entitled to share pro rata in such penal sum."

■ Defendants call upon us to validate their interpretation of this provision. Simply put, it is their contention that Section 7 creates an absolute bar to any other method of collection by a materialman against or involving the owner once a Hardeman Act bond has been posted. Defendants argue that Section 7 goes beyond providing an optional shelter for owners, to the point of disabling them, and their sureties, from making voluntary, contractual efforts to afford materialmen additional protection. Under such a reading of the Texas law, the Transamerica bond becomes a legal nullity in the State, since no suits could have been brought under its provisions after the filing of the Hardeman Act bond.

Neither this Court nor the parties have discovered any state decisions addressed directly to the effect of Section 7 on the freedom of an owner to contract for additional liability. As nearly as we can determine, this is a matter of first impression; and this Court, ever mindful of *Erie*'s teaching, must be particularly careful to consider itself in both spirit and substance a court of the state. For though we are without direct authority on the point in question here, the legislative and judicial tribunals of Texas have provided three inconclusive but illuminating beacons to light our *Erie* way, (1) the direction of the Supreme Court of Texas on the purpose of the 1961 amendments and the spirit in which they are to be interpreted; (2) the use of language in the statute itself; and (3) state court opinions in cases involving other sections of the Hardeman Act.

The Supreme Court of Texas has indicated that the 1961 amendments to the lien statutes were designed to remove technical obstacles to recovery by subcontractors and materialmen. Addressing itself to an owner's argument that Article 5469 of the Act should be interpreted to deny relief that would have been available under the old law, the Court said:

> "If there was a purpose or intention in the Hardeman Act to reduce the measure of protection afforded laborers and materialmen on a construction project . . . it was not expressed in the caption or the emergency clause. True to its stated purpose, the bill continued the overall scheme of its antecedents and improved the protection offered various types of mechanics and materialmen."

Hayek v. Western Steel Company, 1972, 478 S.W.2d 786, 792 (Tex.Sup.Ct.). In line with this view of legislative purpose, the Court endorsed continued reliance on the "rule of long standing that the mechanic's and materialman's lien statutes of this State will be liberally construed for the purpose of protecting laborers and materialmen." In elaborat-

ing on the underlying justification for such a standard, the Court noted that,

> "[o]ne reason for the lien statutes and the liberal rule of construction is that labor and materials lose all further value to the laborer and materialman once they are furnished and put into the house or building, but they usually enhance the value of the property to the benefit of the owner and those who take under him."

*Id.* at 795. Certainly in this case, plaintiff has furnished material and labor which has inured to the benefit of defendant Penner-Ring.

Informed by the opinion in *Hayek* on the proper attitude to assume in applying this statute, we can turn to the language of the Act itself. Section 7 does explicitly provide that once a bond has been properly filed by the prime contractor, as obligor, running to the owner, as obligee, for the benefit of materialmen and for a sum in excess of the contract price, "no suits shall be filed against the owner nor against his property." It explicitly removes the statutory protections provided sub-contractors by other provisions of the Hardeman Act. Consequently, once the bond has been filed, the owner is shielded from both the personal liability and responsibility imposed by Articles 5454, 5463, and 5469, and the vulnerability to liens created by Article 5452. However, an examination of the entire act indicates that the legislature drew a distinction between suits against an individual, either in personam or in rem, and suits filed under the provisions of a bond. Accordingly, although the prime contractor and his surety are named as defendants in a Hardeman Act case, Section 4 of the statute explicitly views such claims as actions to be enforced "against the bond." Though hardly conclusive on the question of Section 7's meaning, the Act's use of language to distinguish simple actions against persons in contract or on a lien from proceedings initiated under a bond is legitimately persuasive in determining the scope of the statute's ban on additional suits *against the own-*

er. It indicates that the legislature distinguished between suits on a bond and suits against individuals, and that a ban on the latter should not necessarily be applied to the former. In light of this distinction, we should not be quick to assimilate into the forbidden category this suit against an independent, voluntarily given security, without the clearest kind of state direction.

This reluctance is considerably bolstered by the view of the terms of Article 5472d offered by the Texas courts. In Barlite, Inc. v. Trinity Universal Insurance Company, 1966, 400 S.W.2d 405 (writ ref'd n. r. e.), the Court of Civil Appeals (San Antonio), though specifically considering only the notice and coverage provisions of the Article, presents a brief description of the effect of Section 7 on materialmen's remedies.

> "Under the terms of Art. 5472d, when a bond with corporate surety is furnished by an original contractor in a penal sum of not less than the contract amount, it constitutes claimant's only *statutory* security—replacing the lien claim on the property." [emphasis added]

400 S.W.2d at 407. When the Texas Supreme Court came to consider *Barlite* after extended procedural wrangling in the lower courts, it also noted that "[t]he bond required by Art. 5472d is to take the place of the liens fixed by Art. 5452 . . . ." Trinity Universal Insurance v. Barlite, Inc., 1969, 435 S. W.2d 849 (Tex.Sup.Ct.). This interpretation is a far cry from the proposition advanced by defendants on this appeal. For defendants urge us to hold that not only does the Act remove the statutory remedies already mentioned, but that it also prevents recovery on any additional *non-statutory* security that the owner might provide.

The constitutional and statutory grants of diversity jurisdiction to the federal courts have placed on us the burden of making a novel interpretation of Texas law. It is not a task which we have welcomed, but rather one that we could not conscientiously have avoided.

However, having been instructed by the Texas Supreme Court to interpret this Act liberally for the benefit of those in plaintiff's class, having observed the distinctions drawn by the legislature between actions on a bond and suits against a person, and having received in *Barlite* the teaching of the Texas courts that Article 5472d was designed merely to consolidate the statutory remedies available to a materialman,[4] we must conclude, however warily, that a Texas court would not find an action on the Transamerica bond covered by the Hardeman Act's ban on additional suits against the owner.

## II. ELECTION OF REMEDIES

■ The Texas law on the limitation of contractual remedies is not disputed by the parties. The Court of Civil Appeals (Dallas) has succinctly stated the general rule, that

> "A contract will not be construed to limit the remedial rights of the parties unless such an intention is clear. But when parties stipulate in a contract what the consequences of a breach of the agreement shall be, such stipulation if reasonable is controlling and excludes other consequences."

Wilburn v. Missouri, Kansas & Texas R. Co., 1954, 268 S.W.2d 726, 731, quoting 12 Am.Jur. § 458. Defendants argue that the Hardeman Act bond, of which plaintiff is a third party beneficiary, provides the degree of explicit limitation of remedies required under state law; and that, by rushing to judgment in the state court suit, plaintiff became bound by the Hardeman bond's prohibition on further actions.

Defendants' argument raises an interesting question on the extent to which a third party beneficiary to several contracts can be precluded from exercising rights under one agreement by the provisions of a wholly separate one. Even assuming that the contract between Braselton and Penner-Ring sought to preclude further suits in the event of a default on required payments to sub-contractors, it is difficult to see how that agreement could affect an independent contractual obligation, also running to plaintiff's benefit, between Penner-Ring and the United States. However, we need not delve into the Texas law of third party beneficiaries, for defendants base their contention that the Hardeman Act bond has explicitly limited available remedies entirely on the fact that the bond incorporated the provisions of Article 5472d. The election of remedies argument therefore depends upon our interpretation of Section 7 for even the most tenuous validity. Since we have not found that provision to bar reliance on additional bonded security, defendants are without any contractual terms excluding the remedy sought on the Transamerica bond.

Nor are we haunted here with possibly inconsistent remedies or double recovery of damages. The Hardeman Act relief was limited only by failure to comply with the quite rigid notice requirement of that statute; and plaintiff has reduced its claim under the Transamerica bond by the amount of the state court judgment. Plaintiff has elected neither contractually nor logically inconsistent remedies in the understandable attempt to recover the full value of labor and material furnished Braselton for defendant Penner-Ring's benefit.

## III. THE TRANSAMERICA BOND

■ The third argument advanced in favor of reversal of the district court

4. Any pursuit of legislative intent in this case is made somewhat illusory by the fact that the situation under consideration here was almost certainly not in the contemplation of the legislature at the time the Act was passed. Generally, construction is a buyer's market with each purchasing enterprise, whether it be the owner, prime contractor, or major sub, holding the whip hand over many sellers anxious for its business. *Cf.* Schultz, "The Firm Offer Puzzle: A Study of Business Practice in the Construction Industry," 19 Chi.L.Rev. 237 (1952). Cases like the one considered here, in which some ultimate owner or user is able and willing to use leverage against the owner for the benefit of lowly materialmen, are doubtless few and far between.

shifts our emphasis from the Hardeman Act to the provisions of the Transamerica bond. Defendants contend that "the [Transamerica] bond sued upon was contemplated to only benefit mechanics and materialmen if and when the United States Government took over the ownership of the United States Post Office Project."

Defendants' reasoning on this point is remarkable. They note first that under the Miller Act, 40 U.S.C. § 270a et seq., any person contracting with the Government to furnish or repair a public building or public work for any sum in excess of $2,000 must provide a performance and payment bond. Although the lease-back arrangement in this case prevented the Miller Act from governing, since the Post Office building would not become a public facility until after its completion, the Department nevertheless required the posting of the Transamerica bond on a Miller Act form. Defendants now argue that the only explanation for the Government conduct *must* have been its desire to provide for payments to materialmen in the event that Penner-Ring would wholly default on its agreement to build and thereby force the Government to step in prematurely as owner under the original agreement. Relying on the Texas rule that persons are assumed to contract only for their own benefit, and that third party beneficiary status must be clearly shown to permit recovery, defendants urge that plaintiff's failure to demonstrate the Government's interest in benefiting materialmen, absent a take-over, blocks relief under the Transamerica bond.

This argument completely misconstrues both the law of Texas and the facts of the case. It is the clear rule in Texas that

> "one who is not privy to the written agreement may demonstrate satisfactorily that the contract was actually made for his benefit and that the contracting parties intended that he benefit by it so that he becomes a third-party beneficiary and eligible to bring an action on such agreement."

Republic National Bank v. National Bankers Life Ins. Co., 1968, 427 S.W. 2d 76, 79 (Ct. of Civil Appeals, Dallas, writ ref'd n. r. e.). *See* Banker v. Breaux, 1939, 133 Tex. 183, 128 S.W.2d 23 (Comm.App., Section A, opinion adopted). *See also* Camco Oil Corp. v. Vander Laan, 5 Cir., 1955, 220 F.2d 897. The state courts have established with equal clarity that the *intention* of the parties to benefit others must be ascertained from the language of the contract itself.

> "In this connection it must be emphasized that it is not the intention which the parties may have had, but failed to express in the instrument, but it is the intention which by said instrument they did express. Stated another way, the question is not what the parties meant to say but the meaning of what they did say."

*Id.* 427 S.W.2d at 79–80. *See* Citizens National Bank v. Texas & P. Ry. Co., 1941, 136 Tex. 333, 150 S.W.2d 1003; Davis v. Andrews, 1962, 361 S.W.2d 419 (Ct. of Civil Appeals, Dallas, writ ref'd n. r. e.).

The Texas law directs us to find the intention of the parties in their written agreement. An examination of the Transamerica labor and material bond reveals language explicitly stating that the agreement is designed to benefit third parties in plaintiff's position, indeed the guarantee of payment to suppliers is the whole purpose of a construction payment bond. The agreement among the United States, Penner-Ring, and Transamerica Insurance Company states that

> "[t]he above named Principal and Surety hereby jointly and severally agree with the Government that every claimant as herein defined, who has not been paid in full before the expiration of a period of ninety (90) days after the date on which the last of such claimants' work was done or performed or materials were furnished by such claimant, may sue on this bond for the use of such claimant, prosecute the suit to final judgment . . . and have execution thereon."

No language could more accurately cover the position of plaintiff. Moreover, the bond is conspicuously lacking in any indication that its provisions will apply only in the event that the Principal, Penner-Ring, should default on its obligation to the Government. Three preconditions to liability under the bond are listed: (1) delivery of labor and material on the project; (2) failure of payment; and (3) delivery of notice. Under the Texas standards for interpretation of a contract urged upon us by defendants, this Court cannot "resort to arbitrary rules of construction where the intention of the parties is clearly expressed in unambiguous language." Citizens National Bank v. Texas & P. Ry. Co., *supra*, 150 S.W.2d at 1006.

Moreover, even were we to find sufficient ambiguity in the instrument to require a search into underlying motives for the Transamerica bond, defendants would fare no better. It is their contention that it makes no sense for the Government to require a bond in this non-Miller Act situation. A careful analysis reveals, however, that the action of the Post Office in contracting for the benefit of materialmen is perfectly understandable in a case such as this. When a project is owned by the United States, and consequently covered by a Miller Act bond, the Government is constitutionally protected from the interference of state liens with its occupancy or disposition of the property. A Miller Act bond must therefore be viewed as an example of laudable Government concern for the welfare of subcontractors deprived of the security of liens, and also as an effort to make work on public projects as attractive and sought after as a job in the private sector. *See* United States for Benefit of Sherman v. Carter, 1957, 353 U.S. 210, 77 S.Ct. 793, 1 L.Ed.2d 776; St. Paul Fire and Marine Ins. Co. v. United States, 8 Cir., 1962, 309 F.2d 22. When the Govern-

ment does not own the project from the beginning, but rather contracts to come in as lessee at a later date, an additional factor argues for the posting of a bond. For in such an instance the interim owner or eventual lessor is not protected from liens; and, without the posting of a payment bond, the Government might well find that its subsequent acquisition, leasing, or disposition of the property would be prevented or complicated by outstanding obligations. At the very least, it is not surprising that departments of the national government would rather make assurance doubly sure through bonds like the one in question. here than wrestle with the intricacies of fifty different lien statutes [5]. The unambiguous language of the bond conforms perfectly to the reasonable motives of the contracting parties. There exists no warrant for denying plaintiff relief on the ground that the Transamerica bond was not intended to operate absent a Government take-over of the project.

## IV. THE NINETY DAY NOTICE

Paragraph 3 of the Transamerica bond provides that:

"No suit or action shall be commenced hereunder by any claimant, (a) Unless claimant . . . shall have given written notices to the Principal and to the Surety above named, within ninety (90) days after such claimant did or performed the last of the work or labor, or furnished the last of the materials for which said claim is made . . . ."

It is undisputed that plaintiff sent notice to defendants on April 2, 1970. In order for such notice to have been timely given, plaintiff must have supplied labor or material on or after January 2, 1970. The court below found that two activities undertaken by plaintiff subsequent to January 2 tolled the notice limitation period: (1) a training school for

---

5. Though the Hardeman Act bond eventually provided full protection against liens under state law, at the time of the original agreement and the making of the Transamerica bond, no Hardeman Act bond had been posted, nor did Penner-Ring's contract with the Government call for any state payment bond.

Post Office maintenance employees conducted by plaintiff from January 21 through January 23, 1970; and (2) the rewiring and recalibration of chillers and cooling equipment "subsequent to January 26." Defendants do not deny that such events took place at the times found by the district court. However, they allege that the actions performed in late January are not within the proper definitions of "work" and "materials furnished" as those terms are used in the Transamerica bond.

Although this project was not governed by the provisions of the Miller Act, the Transamerica bond was executed on a form prescribed by that Act; and the terms of that bond, including the language considered here, have been the subjects of extensive litigation in the federal courts. Defendants urge that, while the Miller Act decisions are not entirely controlling in the construction of contract terms in this diversity case, they are strong persuasive authority and should be seriously scrutinized by this Court. With this proposition we agree. We come to a parting of the ways with defendants, however, on the question of the clarity and direction of Miller Act precedents.

Defendants contend that the rewiring performed by plaintiff did not extend the time for notification under the bond, since it was merely repair work. *See* General Insurance Company of America v. United States, 5 Cir., 1969, 406 F.2d 442; United States for Use and Benefit of Light & P. U. Corp. v. Liles Construction Company, 5 Cir., 1971, 440 F.2d 474. Defendants are correct in their statement of the general rule that "repairs" are not sufficient to toll the notice period. United States for Use of State E. S. Co. v. Hesselden Construction Co., 10 Cir., 1968, 404 F.2d 774. Like all limitations provisions the ninety day notice requirement in the Transamerica bond is designed to encourage the speedy resolution of dis-putes, to permit distribution of assets with a full knowledge of liability, and to provide both debtor and surety with an ultimate, secure repose. These ends would be largely thwarted were materialmen allowed to delay the final reckoning repeatedly by a series of minor adjustments to completed projects. But the federal courts have had difficulty distinguishing such insignificant activity, whether contrived or not, from major work, whether labelled repairs or additions, that arises unexpectedly after the supposed completion.

The limitations period of the bond, requiring suit within one year of the final work or delivery of material[6], has been tolled by as little as the replacement of defective pipe, where the importance of that task was verified by the attitude of Government inspectors. Trinity Universal Insurance Company v. Girdner, 5 Cir., 1967, 379 F.2d 317. A simple delay in required Government approval, however, has been held insufficient ground for the extension of the notice term. United States v. Liles Construction Company, *supra*. On other occasions, the magnitude of the task, or its relation to a significant building component, has determined the final day for notice, with no reference to the Government's position. United States for Use of General Electric Co. v. Gunnar I. Johnson & Son, 8 Cir., 1962, 310 F.2d 899.

Common to all of these decisions, however, is the notion that each case must be judged on its own facts and that sweeping rules about "repairs" offer little help in the necessary analysis. Plaintiff, Johnson Service Company, agreed to install temperature control equipment. According to the findings of the district court and undisputed testimony in the record, plaintiff, while still conducting inspections of the project, learned in late January, 1970, of crucial defects in the operation of its equipment caused by the incorrect plans and specifications of other sub-contrac-

6. Both the ninety day notice period and the one year term for initiating suit are calculated from the same day—the point of last delivery of labor or material.

tors. Without the alteration of these mistakes, the central control panel, which regulated the air conditioning equipment, would not have been a workable installation. The court below specifically found that "the cooling system was not complete until the Plaintiff correctly wired the chillers and recalibrated the equipment."

In light of the unexpected nature of the work, the fact that it arose from faulty plans furnished by others, and the importance of the changes for the entire system, the labor performed by plaintiff after January 26, 1970, falls well within the range of conduct that has been recognized in Miller Act decisions as extending the notice period. *See, e. g.,* Trinity Universal Insurance Company v. Girdner, *supra*; United States for Use of General Electric Co. v. Gunnar I. Johnson & Son, *supra*; United States for Use of Noland Co. v. Andrews, 4 Cir., 1969, 406 F.2d 790; United States for Use and Benefit of Austin v. Western Electric Co., 9 Cir., 1964, 337 F.2d 568. Whether our task be viewed either as a simple examination of the trial court's findings of fact for indications of clear error or as an independent application of law to fact, the decision of the able district judge on this point must stand.

■ Recognizing that the maintenance school operated by plaintiff on January 21–23, 1970, cannot by characterized as repairs by any stretch of judicial fancy, defendants abandon their Miller Act analogy and attack the finding below on the basis of Texas law. They argue that plaintiff's agreement with Godbe to "furnish all labor and materials required to make a complete workable Temperature Control Installation" must be read to limit labor to the energy expended in the installation alone; and that it cannot include the work performed in connection with the school. The district court, however, specifically found that the school was essential for completion of the installation and was, therefore, necessarily included by the parties under the voluntary terms of the labor and material contract and bond. Defendants cite no Texas cases that would require us to overrule this interpretation. Indeed, defendants' one state authority, 47 Texas Jurisprudence 2d, relies on state cases that give the broadest possible reading to the word *labor*, as it is used in construction contracts.

> "The term 'labor' is a very broad term, with a well defined, understood, and accepted meaning, and includes all bodily or intellectual exertion done for a purpose other than the pleasure derived from the performance."

Massachusetts Bonding & Insurance Co. v. Steele, 1927, 293 S.W. 647, 648 (Ct. of Civil Appeals, Waco, writ ref'd). No one has yet contended that plaintiff ran its protracted maintenance school for the sheer fun of it, and ample evidence supports the district court's determination that the school formed an integral part of the original agreement.

## V. JUDICIAL ESTOPPEL

The Texas law on judicial estoppel, applicable to this Texas contract, is succinctly stated in the landmark decision of the state Supreme Court in Long v. Knox, 1956, 155 Tex. 581, 291 S.W.2d 292, 295:

> "The doctrine of judicial estoppel is not strictly speaking estoppel at all but arises from positive rules of procedure based on justice and sound public policy. It is to be distinguished from equitable estoppel based on inconsistency in judicial proceedings because the elements of reliance and injury essential to equitable estoppel need not be present. 'Under the doctrine of judicial estoppel . . . a party is estopped merely by the fact of having alleged or admitted in his pleadings in a former proceeding under oath the contrary to the assertion sought to be made.' 31 C.J.S. Estoppel § 121, p. 390 . . . .
>
> It has likewise been held that it is not necessary that the party invoking this doctrine have been a party to the former proceeding."

Judicial estoppel is a technical rule designed to meet needs of broad public policy. It is directed against those who would attempt to manipulate the court system through the calculated assertion of divergent sworn positions in judicial proceedings. Because the rule looks toward cold manipulation and not an unthinking or confused blunder, it has never been applied where plaintiff's assertions were based on fraud, inadvertence, or mistake. *See* Blackburn v. Blackburn, 1942, 163 S.W.2d 251 (Ct. of Civil Appeals, Amarillo).

Defendants base their claim for application of this rule on two of plaintiff's written statements involved in the previous state court suit on the Hardeman Act bond, in which Braselton Construction and its surety were named defendants: (1) a letter dated December 16, 1969, from plaintiff to Braselton claiming the entire balance due under the installation contract and (2) a lien affidavit filed in state district court on January 16, 1970, stating that "claimant [plaintiff] has furnished all labor and material required to make complete workable temperature control installation . . . " Since both of these alleged completion statements were made prior to the work relied on by the court below, defendants contend that plaintiff's late January activities cannot now be used to demonstrate delivery of labor or material after January 2. However, an examination of the facts indicates that these statements come within neither the letter nor the spirit of judicial estoppel.

■■ Long v. Knox specifically applies the estoppel only in the event that *pleadings* have been made *under oath* in a prior proceeding. The December 16 letter, however, was not included in plaintiff's pleadings in the state court suit. Moreover, the original petition filed in state court was not made under oath, nor was it required to be by the Texas Rules of Civil Procedure [7]. Plaintiff's mere statement on the witness stand or in answer to interrogatories that the December 16 letter constituted notice of unpaid debts does not satisfy the technical requirement of sworn pleadings laid down in *Knox*. Nor does the application of judicial estoppel on the basis of the general language of the letter, which makes no specific reference to completion, comport with the underlying rationale of the doctrine—the preservation of the sanctity of the oath and the elimination of prejudice in the event that specific, calculated, and contradictory positions are taken in judicial proceedings. Such a rule does not allow for the resolution of ambiguities in favor of estoppel. *Cf.* Yarber v. Pennell, 1969, 443 S.W.2d 382 (Ct. of Civil Appeals, Dallas, writ ref'd n. r. e.).

■ Equally troublesome technical and interpretive problems prevent the use of judicial estoppel on the basis of the January 16, 1970, lien affidavit. Though this latter statement was made under oath and does contain strong language of completion, a serious question is raised as to whether the affidavit comes within the definition of "pleadings" as that term is used in *Knox* and the Texas Rules of Civil Procedure. And even were we to resolve this question in favor of a broad reading of *Knox*, defendants would nevertheless fail, if only on the basis of the impromptu nature of the chiller rewiring. For the district court found that the post-January 26 work was unexpectedly forced on plaintiff through no fault of its own. The uncontradicted testimony on which the district court based this finding indicates that plaintiff simply did not know on January 16, at the time its sworn statement was made, the nature of the task that lay ahead. Long v. Knox cannot be extended to reach an affiant whose major failing is the absence of clairvoyance. This is precisely the type of situation for which the inadvertence and mistake exceptions to the application of judicial estoppel were designed. Defendants are once again unable to

7. *See* Rule 93, Texas Rules of Civil Procedure.

bring their case within the precise language or fundamental purpose of the rule. Many courts have at one time or another stretched one of these elements in order to accommodate the other; but no warrants in precedent or common sense can justify the distortion of both urged on us by defendants.

## CONCLUSION

Deceptively simple on its facts, this case has required an analysis of several of the most technical and infrequently litigated provisions of Texas law. We have tread on uncharted paths through lien laws to find the valley of decision. With the guidance provided by the opinion and findings of the district court and the invaluable indications of Texas policy revealed in state court decisions, we have completed our journey. We do not intimate immortality for this opinion, it represents merely the best that mortal federal judges can do.

Affirmed.