Angie **DOCKERY**, Plaintiff,

v.

**NORTH SHORE MEDICAL CENTER, Defendant.**

No. 94–2748–CIV.

United States District Court, S.D. Florida.

Dec. 4, 1995.

Rafael Centurion, Miami, FL, for plaintiff.

Ronald M. Rosengarten, Greenberg, Traurig, Hoffman, Lipoff, Rosen & Quentel, P.A., Miami, FL, for defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

ATKINS, Senior District Judge.

THIS MATTER is before the Court on Defendant North Shore Medical Center, Inc.'s (North Shore) Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. After reviewing North Shore's Motion, Plaintiff Angie Dockery's (Dockery) Response,[1] filed affidavits, the submitted deposition of Ms. Dockery, and the entire record in the case, it is

ORDERED AND ADJUDGED that:

(1) The motion is **GRANTED.** This case is hereby **CLOSED,** all other pending matters are hereby **DENIED** as moot.

(2) North Shore shall not recover costs or attorney's fees in this cause.

## FACTS

This case involves a claim by Plaintiff, Angie Dockery, that her previous employer, North Shore Medical Center, Inc., violated the Americans with Disabilities Act § 12101 *et seq.*, by terminating her employment on the basis of her alleged disability. From July of 1990 until April 1993, Dockery, a diabetic, worked for North Shore, first as a Food Service Representative, and then as a cook. Sometime before March 1993, as a result of her diabetic condition, Dockery developed problems with her right foot, resulting in instructions by her physician that she should not be standing at work. As the condition of her foot worsened, Dockery was granted a leave of absence from work on March 1, 1993. A little more than three weeks later, on March 25, 1993, Dockery underwent surgery to amputate four of her toes and part of her right foot. It is uncontroverted that, after the operation, Plaintiff

1. Plaintiff has failed to submit, pursuant to Local Rule 7.5, any affidavits concerning uncontroverted facts, or to rebut facts as alleged in Defendant's submitted affidavits. The mere allegation of factual disputes found in Plaintiff's Response may not be taken into account by a Court in determining issues of fact to be resolved in a motion for summary judgment. *See Helmich v. Kennedy,* 796 F.2d 1441, 1443 (11th Cir.1986) ("statements in a party's brief, not in proper affidavit form, cannot be considered in determining if a genuine issue of material fact exists."). As a result, under Rule 7.5 of the Local Rules, Plaintiff is deemed to have admitted all facts contained in Defendant's Statement of Material Facts as to Which There is no Genuine Dispute to be Tried. However, even without this omission, any review of the record leads to only one conclusion, and that is that the Motion for Summary Judgment should be granted.

**1554**

was essentially bed-ridden and unable to perform *any* work.

Shortly after the operation, Dockery phoned North Shore and asked her supervisor, Ms. Shaw, to come to see her. Upon Shaw's arrival, Dockery informed her that she could not continue to work as a cook and requested a year's leave of absence with partial salary. Shaw informed Dockery that North Shore would not grant her request and, instead, explained that she could terminate Dockery from North Shore's employ, thus freeing her to receive disability benefits. Shaw also added that, after one year, if Dockery was able to return to work, she would "probably" be re-hired.[2] Dockery, although desiring paid leave as the best option, acquiesced to the plan and, according to later testimony, referred to the decision as being "good" because it meant that she would be entitled to some aid—in the form of disability benefits.

Upon being discharged from the hospital Dockery immediately applied for disability benefits, representing that she was totally disabled as a result of her operation. Her application was, seemingly,[3] approved and she began receiving benefits. Around this time, however, Dockery also contacted her attorney, Rafael Centurion, in the hope of obtaining some legal remedy for her situation. A complaint was filed with the Equal Employment Opportunity Commission, and that agency provided Dockery with the appropriate "right to sue" notice on October 14, 1994. Dockery filed this present action, within the appropriate time, on December 30, 1994.

Today, Dockery contends that she could do "light" work for North Shore, but also admits that she never contacted North Shore about this possibility and has never requested that she be reinstated.[4] Admitting all of the above facts to be true, Dockery nevertheless today takes the position that her termination was discriminatory in purpose and violated the protections of the ADA.

In the present motion, North Shore moves for summary judgment on the following theories. First, North Shore contends that, as a matter of law, when a Plaintiff in an ADA case applies for and receives disability benefits, she is automatically estopped from bringing a claim under the ADA. Second, North Shore argues that, Dockery's admission that she was totally disabled at the time of her termination disqualifies her from the protections of the ADA, given that a totally disabled individual is not a "qualified individual" for purposes of the statute. Finally, North Shore puts forth the argument that, even if Dockery is allowed to bring suit un-

---

**2.** According to uncontroverted submissions by North Shore, Dockery's employment file was marked "re-hire" in anticipation of a re-application for employment.

**3.** The Court has never been supplied with proof that Dockery applied for or was granted disability benefits, other than Dockery's testimony at her deposition. On this issue, at least, the Court is not inclined to give Dockery's admissions that she received disability benefits preclusive effect, given that her answers on this issue are often inconsistent or confused. Nonetheless, in her deposition, Dockery admits that she did apply for some form of disability benefit, and later received those benefits.

Dockery's receipt of benefits leaves the Court to speculate whether she was determined, by the appropriate federal or state agency, to be totally or partially disabled. In a lucid answer on this point, however, Dockery clearly states that she informed the government agent who took her application that she could not work. Other testimony in this case has also demonstrated Dockery's clear belief and assertion that she was totally disabled for at least six-months after her surgery. Given this evidence, and Plaintiff's failure to provide the Court with any evidence to the contrary, the Court accepts as true Defendant's position that Dockery did apply, and was given total disability benefits. This conclusion is further supported by applicable caselaw and federal regulations which require a finding of total disability before benefits may flow to an applicant. *See e.g., Heckler v. Campbell,* 461 U.S. 458, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983); 20 C.F.R. § 404.1520.

The Court also notes that even if this issue could be contested, all the evidence in the record points to the fact that Dockery was totally disabled at the time of her termination, and that she remained so for at least six-months. For reasons to be discussed in greater detail in the remainder of this Order, the Court finds that Dockery's repeated admissions that she was totally disabled for such an extended period of time, leaves this Court with no option other to grant the summary judgment against her, regardless of whether she received disability benefits.

**4.** From her deposition testimony it is clear that Dockery expected North Shore to notify her when she would be allowed to return to work.

der the ADA, there is no basis for finding that North Shore acted in discriminatory fashion by terminating her.

### STANDARD OF REVIEW IN RULE 56 MOTIONS

Under Fed.R.Civ.P. 56, a party is entitled to judgment as a matter of law if there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(c). First, the moving party bears the burden of identifying the portions of the record, including pleadings, depositions, admissions, answers to interrogatories, and affidavits, which demonstrate the absence of a genuine issue of material fact. *Celotex Corporation v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Tipton v. Bergrohr GMBH–Siegen*, 965 F.2d 994, 998 (11th Cir.1992). Once the moving party meets this burden, it is the non-moving party's responsibility to "go beyond the pleadings" by filing affidavits, depositions, answers to interrogatories, or admissions and pointing to specific facts which show there is a genuine issue of material fact. *Tipton*, 965 F.2d at 998.

In reviewing a motion for summary judgment, the court must consider all the evidence in the light most favorable to the non-movant. *Earley v. Champion Int'l. Corp.*, 907 F.2d 1077, 1080 (11th Cir.1990). If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial. *Clemons v. Dougherty County, Ga.*, 684 F.2d 1365, 1368–69 (11th Cir.1982). Applying this rigorous standard to the facts as they are presented to the Court, it is clear that no disputed issues of material fact exist to aid Plaintiff in resisting this motion.

### THE ADA

Before a plaintiff can convince a court to decide on the merits of an ADA claim, she must first prove that she is entitled to the ADA's protections. The ADA prohibits discrimination "against a qualified individual with a disability because of the disability of such individual in regard to" employment status—including termination. 42 U.S.C. § 12112(a). "Discrimination" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an ... employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A).

For the purposes of the present motion, both the Court and North Shore readily admit that Dockery is disabled as that term is contemplated under the ADA. However, merely having a disability does not automatically extend the protections of the ADA to that individual. Congress specifically limited the ADA's protections to only those disabled individuals who are otherwise qualified to hold the position in question. *See* 42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(m) (1994). Thus, the central question is whether Dockery is an "otherwise qualified individual" and, therefore, capable of invoking the ADA's protections.

On one level, North Shore's motion for summary judgment makes the assumption that if an employee is totally disabled at the time of her termination, then she is not protected under the ADA as a qualified individual. It is undisputed in this case that Dockery, at the time of her termination, and for a period of at least six-months, was totally disabled and incapable of performing any work. It is also undisputed that Dockery, even today, could not perform her previous job as a cook, and would need to be reassigned to a position with less physical demands.

Dockery's mere admitted incapacitation at the time of her termination, however, does not, as North Shore contends, automatically lead to the *legal* conclusion that she is not a qualified individual under the ADA. According to the ADA, a "qualified individual" is one who "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds...." 42 U.S.C. § 12111(8). A reasonable accommodation is an accommodation that would "enable [the employer's employees with disabilities] to enjoy equal benefits and privileges of employment as are enjoyed by employees without disabilities." 29 C.F.R. § 1630.2(*o*). A reasonable accommodation may include, but is not limited to, such ameliorations as: (1)

additional unpaid leave; (2) job restructuring; (3) part-time or modified work schedules; or even (4) reassignment to a vacant position. 42 U.S.C. § 12111(9)(B). Further, an employer must provide such "reasonable accommodations," unless it can be shown that the accommodation would impose an undue hardship on the operation of its business. 42 U.S.C. § 12112(b)(5)(A). Thus, a person, totally disabled at one point, may be considered a qualified individual if the allowance of a leave of absence or possible reassignment would provide them the opportunity to resume working at a later date.

To this end, Dockery maintains that, with certain reasonable accommodations, she would have been able, eventually, to return to work, and should therefore be considered an qualified individual. From the record,[5] it appears that Dockery is arguing that had she been granted extended leave, either with or without pay, and then reassigned to a position requiring limited physical exertion, she would have been able to continue in North Shore's employ. The failure of North Shore to provide these allegedly reasonable accommodations is the gravamen of Dockery's case. If the record can support an inference that North Shore should have provided these accommodations, and that with their provision Dockery would have been able to return to work, then this motion for summary judgment would have to be denied.

## ESTOPPEL

North Shore takes the position that Dockery should be precluded from arguing that she is a qualified individual on the basis that she applied for, and apparently received, disability benefits. An acceptance of this argument by the Court would obviate the need for determining whether North Shore failed to provide reasonable accommodations, and whether Dockery, with these accommodations could have continued to work.

■■■ In support of its contention that application for disability benefits estops an individual from later claiming that she is an otherwise qualified individual, North Shore cites ample authority from various federal district courts and courts of appeal from across the country.[6] See e.g., August v. Offices Unlimited, Inc., 981 F.2d 576 (1st Cir. 1992) (plaintiff who certified on form for disability benefits that he was "totally disabled" was precluded as a matter of law from arguing that he is a qualified individual under Massachusetts law or the Rehabilitation Act);[7] Cheatwood v. Roanoke Industries, 891 F.Supp. 1528 (N.D.Ala.1995) (holding that plaintiff who had previously testified at workmen's compensation hearing that he was totally disabled was now judicially estopped from bringing an ADA suit); McNemar v. The Disney Stores, Inc., 1995 WL 390051 (E.D.Pa.1995) (plaintiff, with physician's supporting documents, who represented on disability benefits application that he was totally disabled was estopped from raising claim of ADA violation); Garcia–Paz v. Swift Textiles, Inc., 873 F.Supp. 547 (D.Kan.1995) (holding that where a plaintiff has applied for total disability benefits, she is thereafter estopped from bringing a claim under the ADA); Reigel v. Kaiser Foundation Health Plan of N.C., 859 F.Supp. 963, 967–70 (E.D.N.C.1994) (no reasonable juror could find for plaintiff given representations on disability applications that she was totally

---

5. The Court in finding the bases for reasonable accommodation upon which Dockery relies, has allowed for every reasonable inference in her testimony. Plaintiff has not, either in her complaint or in response to this motion, provided a clear delineation of what reasonable accommodations she feels that North Shore failed to make. Nonetheless, the Court has gleaned from Dockery's deposition testimony, and from her unsworn response to this motion, the various accommodations discussed above in the text.

6. The Court notes that none of the cited cases is from the Eleventh Circuit Court of Appeals, or the Supreme Court. Further research by the Court has failed to turn up any controlling prece-

dent on this issue. As a result, the Court is free to decide this issue regardless of the persuasive power of the cited opinions.

7. According to the express language of the ADA that its provisions be interpreted in a manner that "prevents imposition of inconsistent or conflicting standards for the same requirements under [the ADA] and the Rehabilitation Act of 1973," 42 U.S.C. § 12117(b), cases interpreting the scope of the Rehabilitation Act are relevant for determining the proper analysis in ADA cases. See Moore v. Sun Bank of North Florida, N.A., 923 F.2d 1423 (11th Cir.1991). See also Wooten v. Farmland Foods, 58 F.3d 382, 385 (8th Cir.1995).

disabled); *Kennedy v. Applause, Inc.*, 1994 WL 740765 (C.D.Cal.1994) (where plaintiff has made representations on disability benefits forms that she was totally disabled, court concluded that no reasonable juror could find for plaintiff). *See also Nguyen v. IBP, Inc.*, 905 F.Supp. 1471 (D.Kan.1995) (a plaintiff who represents on a disability form that he is totally disabled is thereafter judicially estopped from litigating that issue at trial); *Fussell v. Georgia Ports Authority*, 906 F.Supp. 1561 (S.D.Ga.1995) (agreeing with rationale that application and approval of disability benefits judicially estops an individual from being a qualified individual under the ADA).

Some of these cases do not support the proposition, as North Shore suggests, that courts have ruled that the mere application or approval of disability benefits automatically estops a plaintiff from bringing a suit under the ADA. For instance, the decision in *Cheatwood v. Roanoke Industries*, 891 F.Supp. 1528 (N.D.Ala.1995), involves the use of judicial estoppel against a plaintiff who had testified, under oath, at a worker's compensation hearing. This case presents clearly different facts than those which only involve the filling out of disability applications.

Further, the courts in *Kennedy*, and *Reigel* merely determined that the existence of sworn statements by plaintiffs, including applications for disability benefits, coupled with all other evidence in the case, led to the conclusion that no reasonable juror could find for plaintiff. Such a finding is not the same as summarily dismissing each and every case, regardless of circumstance, on the basis

of a blanket application of judicial estoppel on the mere showing of application for disability benefits.[8]

However, it is clear that a number of jurisdictions have begun to accept the proposition that application for disability benefits estops a plaintiff from thereafter arguing that she is a qualified individual under the ADA. For instance, the District Court of Kansas, in *Garcia–Paz*, ruled that, as a matter of law, application for disability benefits which swears to the total disability of the applicant *estops* the applicant from later claiming to be a "qualified individual" for purposes of the ADA. As the *Garcia–Paz* court concluded, "[h]aving collected substantial benefits, based on ... representations [made in disability applications] plaintiff is estopped from now claiming that she *could* perform the essential functions of her position." 873 F.Supp. at 555.

The rationale in *Garcia–Paz* has led to dismissals in the *McNemar*,[9] *Nguyen*, and *Berry*[10] decisions,[11] and has been favorably cited in the *Fussell* opinion.[12] Because these courts, based on a misapplication of theories of estoppel, considered application for disability benefits automatically dispositive without any consideration for other available evidence, this Court declines to adopt this approach.

Of the various forms of estoppel which courts have traditionally applied, the only possible form which suits cases such as these is "judicial estoppel." As the court said in *Nguyen*, "courts agree that an employee who represents on a benefits application that he is

---

**8.** The court in *Kennedy*, found that "[g]iven the compelling admissions contained in plaintiff's disability records ... the Court concludes that plaintiff has failed to demonstrate that she was qualified to perform the essential functions of her job.... the Court is convinced that no reasonable fact finder could arrive at a contrary conclusion." 1994 WL 740765, *6 (C.D.Cal.).

In *Reigel*, the Court concluded that, based on numerous insurance and other disability applications, plaintiff's repeated admissions that she was totally disabled "convinced [the court] that no rationale [*sic*] fact finder could" find for plaintiff. 859 F.Supp. at 970.

**9.** 1995 WL 390051 at *3–4. The court applied judicial estoppel, and in so doing, found that no reasonable juror could have found for plaintiff.

**10.** *Berry v. Norfolk Southern Corp.*, 1995 WL 465819, *2 (W.D.Va.1995). In that case, Plaintiff had applied for, and received over $88,000 in disability benefits. The court held that representations of total disability in applying for those benefits "estop[s] Berry from asserting a disability act claim."

**11.** *See also Harden v. Delta Air Lines Inc.*, 900 F.Supp. 493 (S.D.Ga.1995) (citing with approval, the holding that an individual should not be allowed to swear to total disability on benefits applications, and then later attempt to argue that he was a qualified individual).

**12.** 906 F.Supp. at 1574–77.

disabled and unable to perform the duties of their [sic] former jobs is *judicially estopped* from arguing that he is capable of performing the essential functions of his former work." 905 F.Supp. at 1484 (emphasis added).

 Judicial estoppel "is applied to the calculated assertion of divergent sworn positions . . . and is designed to prevent parties from making a mockery of justice by inconsistent pleadings." *American Nat. Bank v. Federal Dep. Ins. Corp.,* 710 F.2d 1528, 1536 (11th Cir.1983). This well-settled formulation of the Eleventh Circuit's approach to judicial estoppel obviously provides for two elements. First, it must be shown that the allegedly inconsistent pleadings were made under oath in a prior proceeding. Second, such inconsistencies must be demonstrated to have been calculated to make a mockery of the justice system.[13]

 The first element begs the question whether "prior proceedings" applies to any action taken under oath, including the filing of a disability application, or is intended solely to apply to judicial, or at least quasi-judicial proceedings. The Court believes that the latter is the proper method. A survey of applicable caselaw in the Eleventh Circuit demonstrates that the use of judicial estoppel has been limited to only those instances where a party attempts to put forward a position clearly inconsistent with that undertaken in prior judicial or quasi-judicial proceedings. *See e.g., Chrysler Credit Corp. v. Rebhan,* 842 F.2d 1257 (11th Cir.1988); *American National Bank v. F.D.I.C.,* 710 F.2d 1528 (11th Cir.1983); *Johnson Service Co. v. Transamerica Insurance Co.,* 485 F.2d 164 (5th Cir.1973). Judicial estoppel, as this court understands it, should not be applied to oaths undertaken in administrative filings, as in these ADA cases.

 As for the second element, the Court looks to a pronouncement of the Fifth Circuit Court of Appeals in *Johnson Service Co. v. Transamerica Insurance Co.,* 485 F.2d 164

(5th Cir.1973).[14] In that case, the Court of Appeals held:

> Judicial estoppel is a technical rule designed to meet the needs of broad public policy. It is directed against those who would attempt to manipulate the court system through the calculated assertion of divergent sworn positions in judicial proceedings. Because the rule looks toward cold manipulation and not an unthinking or confused blunder, *it has never been applied where plaintiff's assertions were based on fraud,* inadvertence, or mistake.[15]

Although the Court of Appeals was applying Texas law in that case, this Court feels that it is a correct interpretation of the extent and purpose of judicial estoppel—formulated through careful application of the common law rules and principles underlying the doctrine. *See Chrysler Credit Corp. v. Rebhan,* 842 F.2d 1257, 1261 (11th Cir.1988) ("where federal issues are involved, federal courts may look to common law or to the policies supporting the doctrine itself for guidance in establishing an appropriate formulation"). As a result, the Court does not feel the need to alter the rule as espoused in *Johnson* and adopts it as the proper enunciation for this case.

 Under either element for determining whether judicial estoppel is an appropriate sanction against a party seeking to take inconsistent positions, it is clear that it does not apply in cases like these. First, although a plaintiff who applies for disability benefits may indeed swear that they are totally disabled, undertaking such an oath in an administrative filing and then later attempting to take a different position in a court of law, does not threaten the integrity of the judicial system nor does it seem to be an attempt to make a mockery of the courts. Certainly a plaintiff, by taking this course, may be engaging in fraudulent conduct. However, the Court concludes that unless such conduct is undertaken for the purpose

---

**13.** *See Johnson Service Co. v. Transamerica Insurance Co.,* 485 F.2d 164 (5th Cir.1973).

**14.** The Eleventh Circuit, in the *en banc* decision, *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions

of the former Fifth Circuit rendered prior to October 1, 1981.

**15.** 485 F.2d at 175 (emphasis added) (citation omitted).

of manipulating the judicial system, judicial estoppel is an inappropriate sanction.[16]

Finally, the Court notes that the "[a]t its core, the doctrine of judicial estoppel ensures that a party will not argue 'inconsistent positions to gain an unfair advantage over its adversary.'" *Sullivan Properties, Inc. v. City of Winter Springs*, 899 F.Supp. 587 (D.Fla.1995) (*citing Alaska Airlines Inc. v. United Airlines Inc.*, 948 F.2d 536, 540 (9th Cir.1991)). The receipt of disability benefits in no way provides an unfair advantage to a plaintiff in an ADA case. To the contrary, such an admission can only hinder any attempt by a plaintiff to later claim that she was not totally disabled.

Any analysis of the proper application of the rule of judicial estoppel leads this Court to conclude that it is not applicable to these situations, and the purpose for which it has been promulgated would not be served by its application. For these reasons, the Court feels that it must oppose the growing chorus of judicial opinions which proceed to dismiss cases brought under the ADA purely on the technical grounds that an inconsistent position was taken by the plaintiff in his or her administrative filings.[17]

Of course, this does not mean that a plaintiff's statements on disability applications, or other analogous instruments, are not relevant to a determination on the success of a motion for summary judgment. Indeed, the fact that a plaintiff has made sworn statements that she is disabled will, most surely, hamper her ability to survive any motion for summary judgment. The above discussion was intended to demonstrate that, as a matter of law, a plaintiff should not be estopped from bringing a claim under the ADA merely because she has filed for, or received, disabil-ity benefits. The receipt of disability benefits is one more piece of evidence that a Court should take into account when determining whether, as a matter of law, plaintiff can survive a motion for summary judgment.

## DOCKERY IS NOT A QUALIFIED INDIVIDUAL UNDER THE ADA

Although this Court refuses to dismiss the case under doctrines of estoppel, it is still clear, under any reading of the facts, that Dockery is not a qualified individual for purposes of the ADA, and is therefore barred from invoking the Act's protections. As was discussed above, there can be no doubt that at the time of the termination, Dockery was totally disabled and incapable of continuing her employ.[18] As a result, she could only be considered a qualified individual if she can show that she would have been capable of continuing her employ if North Shore had provided reasonable accommodations. However, from the record, it is clear that the accommodations that Dockery is now suggesting are not *reasonable* as a matter of law.

## REASONABLE ACCOMMODATION

Prior to Ms. Shaw's decision to terminate Dockery, the record shows that Dockery communicated that she desired a year's leave of absence with a partial salary. Dockery's deposition contains the following:

> A.) ... I never see [Ms. Shaw] until I call her one morning to come, and I asked her for the lease [*sic*] of absence, you know. I asked her would she give me one year. And she said, "Well, we can't give you one year leave of absence. We would have to

**16.** By undertaking such a strategy, a plaintiff may be exposing herself to potential liability in a separate fraud proceeding. However, the appropriate sanction in such an instance is for the governing authority to take action against the party in question. It is not the province of the courts in cases like these to enforce perjury or fraud penalties by excluding a plaintiff from formulating her case as she sees fit within the bounds of allowable procedure.

**17.** In making this decision, the Court does not render any opinion whether judicial estoppel is an appropriate sanction where a plaintiff has, under oath, taken an inconsistent position at an administrative hearing.

**18.** Here the Court notes that the apparently undisputed application and receipt of disability benefits is a probative piece of evidence showing that Dockery was, in fact, totally disabled at the time of her termination. However, as has been discussed previously, the mere fact that Dockery was totally disabled the day she was terminated does not mean that she is not a qualified individual.

terminate you so you could get on disability." That's the way she left it.

Another relevant section contains the following colloquy:

Q.) What did you talk to your daughter about?

A.) I was telling her that I don't know how I'm going to help her to pay the bills, because I don't know—I said, "I need some help from somewhere." You know, so we kept trying to figure out, you know, how we get some help—for me to get some help, because I was fired from the job and from, you know—if she—I was thinking if [Ms. Shaw] could have give me a help, I mean pay part of my—half of my check until I got back on my feet or something. That's what I was mostly asking for help.

Q.) Who should pay half of your check?

A.) The hospital. Because I was working there with the, I thought maybe they would—the insurance would, you know, pay half of what I was making until I got back on my feet.

Q.) Did you ask Miss Shaw that?

A.) I did. I asked her that, and she said that it weren't no way that—I guess she talked like the company don't pay you that.

Q.) In other words, the hospital would not be able to pay you—

A.) Right.

Q.) while you weren't working?

A.) Right. Weren't able to work. She couldn't pay me like half of my check or whatever.

Because I know in a year's time I would have been back on my feet and back to work. And if they pay—help me out until I got back on my feet. That's what I asked them for. But I was asking for help.

So then we decided to call Mr. Rafael, to see if we could get some help from somewhere, because I couldn't get no help from the hospital. That's why, you know— that's what I was asking.

It is not entirely clear from the above discussion whether Dockery was requesting only a year's leave of absence with pay, or whether she would have accepted the absence without pay. Nonetheless, the distinction does not matter for the purposes of this motion, as the law clearly does not envision forcing employers to grant even a year's *unpaid* leave of absence.

 It is true that under the ADA, a reasonable accommodation might include "additional unpaid leave." However, neither the ADA nor the regulations promulgated to aid in interpreting that law provide any guidance as to how long such additional unpaid leave must be. Of course, the reasonableness of this interpretation is generally a question of fact, and would normally preclude the granting of a motion for summary judgment on this basis. However, this Court concludes that, as a matter of law, an employer is not required to grant a one-year leave of absence, and such an accommodation is, on its face, unreasonable.[19]

 Of course, if Dockery could show that North Shore had a policy of generally granting such extended leaves of absence to employees, or that it had in the past, on an *ad hoc* basis, provided such leaves, then this decision may well have been different. However, Dockery has not offered any proof, nor even submitted an allegation that this is a possibility. Instead, the only evidence before the Court on this issue is in the form of an affidavit from Richard Levy, the Human Resources Director of North Shore. According to Mr. Levy:

It is not North Shore's policy to provide any employee a year's leave of absence with a guaranteed position on his or her return. Further, it is not North Shore's policy to offer any employee a leave of absence with compensation, whether at full salary or at some percentage thereof.

---

**19.** The Court notes that the recently enacted *Family and Medical Leave Act*, 29 U.S.C. § 2601 *et seq.* (1993), allows for only twelve (12) weeks leave of absence due to a "serious health condition." § 2612(a)(1)(D). The leave of absence, as mandated under the Act, may be paid or unpaid. Of course, the *ADA* is not intended to be inter-

preted according to the provisions of the *Family and Medical Leave Act*. The Court only notes that, as a matter of reasonableness of time to be given off, it is relevant that Congress has limited a employee's *rights* under the Act, to a maximum of twelve (12) weeks leave a year.

The ADA does not require that employers provide greater benefits to disabled employees than it grants to its other employees. As a result, Dockery cannot claim that, as a disabled employee, she is entitled to greater leave rights than other employees. *See e.g., Emrick v. Libbey–Owens–Ford Co.,* 875 F.Supp. 393 (E.D.Tex.1995); *Reigel,* 859 F.Supp. at 973. Since North Shore does not have, nor has it ever had a policy of granting a leave of absence for such an extended period of time, this Court concludes that such a request is, on its face, unreasonable.

The Court also recognizes that Dockery now requests reassignment to another position with lighter physical demands. To this end, Dockery's deposition supports her view that a position in the cafeteria would meet her needs. Nonetheless, Dockery has fully admitted that she could not work for a minimum of six-months, and did not believe she could return to work for at least a year. Since this Court has concluded that, as a matter of law, a requested one-year leave of absence is not a reasonable accommodation as foreseen under the ADA, it is not necessary to determine whether reassignment to such a position could be considered a reasonable accommodation.

■ In the end, there is nothing in the ADA to support the contention that an employer, faced with a completely disabled employee totally incapable of performing the essential functions of her job, and admittedly incapable of performing any work for at least six months, is forced to grant a one year leave of absence with the guarantee of a job upon the expiration of that year.

### DISCRIMINATORY INTENT

Even if it is possible to argue that a one-year leave of absence is a reasonable accommodation, and that subsequent reassignment to another position is also reasonable, the Court would still grant North Shore's motion on the basis that no reasonable juror could find that North Shore acted with discriminatory intent in terminating Dockery.

On one level, the Court notes that there is overwhelming evidence that Dockery acquiesced and approved of her termination in order to obtain disability benefits. At one point in her deposition testimony, Dockery,

speaking about the fact Ms. Shaw's decision to terminate allowed her to apply for disability benefits, stated:

A.) . . . . . some of the employees come and say, "Angie, that's good that Miss Shaw— if she terminate you so you could get on disability." I said, "Yeah. That's right. That's good." That's the way I left it. That's good that she did me like that.
Q.) You said that was good?
A.) That's what I said. Because they was saying, "Angie, she terminate you so you could get on disability." I say, "Yeah. You're right."

It is troubling that a plaintiff, who acquiesces in her termination, and thereafter professes that she felt that it was done solely for her benefit, may now file a claim under the ADA claiming that the termination was discriminatory. Nonetheless, the Court is willing to allow Plaintiff the inference that she opposed her termination, and only agreed due to her ignorance of the law or helplessness to oppose the situation.

■ Regardless of what Dockery's views towards her termination were, the manner in which she was terminated cannot allow a determination that North Shore acted with discriminatory intent. Every scrap of evidence that has been presented to the Court comports with North Shore's contention that its termination of Dockery was done completely for her benefit. Plaintiff, in her unsworn opposition to this motion, has argued that, even though Ms. Shaw represented to Dockery that she was being terminated so that she could receive disability benefits, a jury could conclude that this rationale was mere pretext. It has previously been held that "a mere scintilla of evidence supporting the non-movant's position" does not fulfill the burden of showing that an issue of material fact exists. *Walker v. Darby,* 911 F.2d 1573, 1577 (11th Cir.1990). Plaintiff's contention on this point lacks even that minimal amount of evidentiary support. Dockery's own recollection of the events, as evidenced in the deposition excerpts set out above, shows that Ms. Shaw's decision to terminate Dockery was done to allow her time to recover while receiving disability benefits. Since North Shore is not required to grant a year's leave

of absence, Dockery's termination was the next best thing that could be done for her.

Further, North Shore marked Dockery's personnel file for "rehire." It is apparent that all Dockery had to do was pick up the phone and call North Shore in order to be rehired. Had Dockery called, and then been turned down, this case may have been different. However, no call was made and Dockery sat at home and apparently waited for North Shore to contact her and ask her to return to work. Clearly, the burden was on Dockery to initiate events with North Shore and inform them when she could return to work, and what work she could perform. Her failure to do so, coupled with all other evidence presented on this issues, leads to the inevitable conclusion that no reasonable fact finder could find that North Shore acted with discriminatory intent in terminating Dockery.

DONE AND ORDERED.