UNITED STATES, for the Use and Benefit of MOD–FORM, INC., a Michigan Corporation, Defendant,

v.

BARTON & BARTON COMPANY, a Michigan Corporation, Defendant/Counter–Plaintiff

and

Employers Insurance of Wausau, Defendant.

No. 90–CV–71387–DT.

United States District Court, E.D. Michigan, S.D.

Aug. 13, 1991.

John C. Schultes, Detroit, Mich., for plaintiff U.S. for the Use and Benefit of Mod–Form, Inc.

Patrick A. Facca, Federlein, Grylls & Keranen, Royal Oak, Mich., for defendant/counter-plaintiff Barton & Barton Co.

Patrick A. Facca, Federlein, Grylls & Keranen, Royal Oak, Mich., for defendant Employers Ins. of Wausau.

## OPINION

GADOLA, District Judge.

### Background of Litigation

This cause was tried to the court as a non-jury matter.

The suit involves claims by plaintiff Mod–Form, Inc., as subcontractor, against defendant Barton & Barton Company, the general contractor on a project for the remodeling of a stair tower building at the U.S. Army Detroit Arsenal. The claims are made under the Miller Act, and are governed thereby. 40 U.S.C. § 270a *et seq.*

Barton & Barton Company was awarded the contract for this remodeling work and then subsequently, on October 20, 1986, Mod–Form, Inc. and Barton & Barton Company entered into a subcontract by the terms of which Mod–Form was to manufacture and install precast insulating panels and to do related work for the project, for a contract price of $50,000.00.

Barton & Barton, as general contractor on this U.S. Army contract, was required to furnish a performance bond, and such bond was issued by defendant Employers Insurance of Wausau.

During the Fall of 1987 Mod–Form commenced its work under its subcontract on the project.

The original subcontract price of $50,-000.00 was modified on September 29, 1987, and the subcontract price was increased by $11,268.00 for a total revised subcontract price of $61,268.00 as the result of a modification of Barton & Barton's contract with the Army.

The panels were manufactured by Mod–Form, with manufacture completed by October 9, 1987. The panels were delivered to the project site, the U.S. Army Detroit Arsenal, in December of 1987, but were not installed by Mod–Form until a subsequent date, there being no crane on site at that time for the required erection work.

On November 25, 1987 Mod–Form submitted its invoice to Barton & Barton in the amount of $51,268.00, covering "pre-cast aggregate panels and miss (sic) hardware". The invoice also contained a notation that the additional charge for installation of the panels had been calculated by Mod–Form to be $10,000.00.

On April 5, 1988 a second invoice was submitted by Mod–Form to Barton & Barton making the following charges:

| | |
|---|---|
| "Installation of pre-cast panels at 100% completion: | $10,000.00 |
| Storage on trailer due to delays not by Mod–Form including 10% overhead and 10% profit: | 1,956.00 |
| Total: | $11,956.00" |

On January 9, 1989 the Department of the Army suspended Barton & Barton's work on the project "to evaluate whether continuance of this project is in the best interests of the government." On May 22, 1989 the Department of the Army lifted the suspension of contract work.

Prior to these developments, on October 31, 1988 the Army had requested that Barton & Barton quote a price for certain additional possible work including:

(a) the installation of additional structural steel support work; and

(b) the repositioning of the panels.

This work was not required under Barton & Barton's then existing contract with the Army on this project. The Army in its communication of October 31, 1988 also notified Barton & Barton that it must:

"(c) "correct existing defective welds" as "a no cost item"."

This last item (c) was the correction of allegedly defective welds previously made by Mod–Form under its subcontract, in installing the panels which it had manufactured.

On June 5, 1989 the Department of the Army entered into another modification of its contract with Barton & Barton, providing for the additional work outlined in its communication of October 31, 1988 as items (a) and (b), (which was additional work in which Mod–Form was not to be involved) and also requiring the aforementioned correction of existing defective welds (item (c) in the October 31, 1988 communication) as a "no cost item", which would be work to correct defects in Mod–Form's prior subcontract work.

On June 1, 1989 Barton & Barton informed Mod–Form that the Army had, on May 22, 1989, lifted its "suspension of work" order of January 9, 1989 and that Mod–Form "can now proceed with the corrective work required to make your in place work acceptable to the government." This communication from Barton & Barton also stated that Mod–Form had informed Barton & Barton that it would not do any corrective work (i.e., repair of the allegedly defective welds) until it had been paid "for work already performed". Barton & Barton further advised Mod–Form that it would not be paid "for work that is not acceptable, before the corrections have been performed and accepted by the government." The letter further stated that if Mod–Form refused "to do the necessary corrective work, to make the work acceptable, then Barton & Barton Company will be forced to hire another contractor to perform the corrections and charge the costs to Mod–Form, Inc. You will have until June 23, 1989 to make whatever corrections will be required for acceptance."

On June 16, 1989 Mod–Form responded by letter informing Barton & Barton that "[w]e are willing to make corrections to our welds as per your request but are unable to until the additional work required by the owner is done. The additional work requested by the owner does not fall under our contract." The letter also contained a demand by Mod–Form for payment of its invoices by Barton & Barton.

On August 17, 1989 Barton & Barton informed Mod–Form by letter that it was proceeding to correct the allegedly defective welds, that the corrective work would commence August 21, 1989, and that Mod–Form would be held responsible for the cost of correcting the defects.

Barton & Barton retained Greiner Erection Company to correct the welding defects, and the corrective work was per-

formed by Greiner on August 21, August 22, August 23, August 24, August 25 and August 28, 1989 at a cost to Barton & Barton of $3,328.00.

Ultimately, the Army terminated its contract with Barton & Barton in January 1990, for reasons not associated with any contractual responsibilities of Mod–Form.

It is the claim of plaintiff that it is entitled to receive payment of its two invoices, $51,268.00 on November 25, 1987 and $11,956.00 on April 5, 1988, being a total of $63,224.00, less payments received of $20,000.00 on January 26, 1988 and $26,141.00 on March 7, 1988, leaving a balance of $17,083.00. Plaintiff concedes, however, that defendants may be entitled to credits of $800.00 for flashing work and $480.00 for caulking work, which arguably were left uncompleted by plaintiff, and which, if such credits were given, would result in a revised balance owing of $15,803.00.

Defendants maintain that plaintiff's claim is barred under the Miller Act by a one year statute of limitations, which requires that suit must be filed within one year from the date of the last furnishing of labor or materials in order for a contractor on a government project such as this to be entitled to recover. Defendants maintain that the last of plaintiff's contract work was performed in April of 1988, and that, since plaintiff's suit was not filed until May 17, 1990, it is effectively barred by the aforesaid statute of limitations contained in the Miller Act. Defendants further maintain that, if they do not prevail on their statute of limitations defense, they are nevertheless entitled to total credits of $13,248.16 due to plaintiff's alleged deficiencies in performance, and that in addition plaintiff's claim for the cost of trailer rental for storage of the panels in the amount of $1,956.00 is invalid, thereby resulting in a total possible balance of only $2,078.84.

### Findings of Fact

It is the claim of plaintiff that it last furnished materials to Barton & Barton on this project on August 22, 1989, and that therefore the filing of this action on May 17, 1990 was timely under the Miller Act. Defendants maintain, to the contrary, that plaintiff furnished no labor or materials on this project after April of 1988.

Frank Grassi, President and sole shareholder of Mod–Form, testified that he came to the project site on August 22, 1989, both to correct the defective welds as required by the Army and by Barton & Barton and also to deliver additional miscellaneous hardware to the project site, as required by its subcontract.

The Greiner Erection Company was on the site on August 22, 1989 correcting the defective welds, having been retained to do so by Barton & Barton. Testimony indicated that while Mr. Grassi did come to the site on that date, he was denied access thereto. The site is a military installation and access can be obtained only by a pass. Larry Barton, chairman of Barton & Barton, testified that he was contacted by guards at the arsenal gate and asked whether he wanted Mr. Grassi admitted to the site and that he informed the guards that Grassi should be denied access.

On April 25, 1988 Mod–Form notified Barton & Barton, by its invoice, that installation of the pre-cast panels was 100% completed, and made claim for the entire $17,083.00, which is the exact amount of plaintiff's total claim in this suit.

On May 23, 1989 Mod–Form advised Employer's Insurance of Wausau, in writing, that it was due the amount of $17,083.00 and that this amount had been due *since March 9, 1988* (emphasis added). On December 18, 1989 Mod–Form again wrote to Employer's Insurance of Wausau, stating that the full contract balance of $17,083.00 had been due to it "for almost two years now".

Mod–Form's own ledger and accounting records show completion of installation of the panels and accrual of the full balance of $17,083.00, as of April 22, 1988.

A business record of Barton & Barton, entitled "Superintendent's Daily Report", of April 21, 1988 contains the following notation:

"Mod–Form Stair Tower H is finished. They are align panels and leveling. Crane left at noon."

All this documentary evidence confirms that plaintiff had made its total claim of $17,083.00 for completion of all its contract work, including all labor and materials, not later than April 25, 1988.

It satisfactorily appears to the court, by the clear preponderance of the evidence, that plaintiff last furnished materials or labor to Barton & Barton on this project on or about April 25, 1988.

The claim by plaintiff that it delivered additional miscellaneous hardware to the project site on August 22, 1989 is simply not credible, and appears to the court to be a rather transparent artifice by which plaintiff seeks to circumnavigate the one year period of limitations under the Miller Act. If plaintiff came to the site at all on August 22, 1989, the court finds that it was only for the purpose of correcting its own defective contract work, i.e. the defective welds, and from the evidence it appears highly unlikely that any representative of plaintiff was even granted or allowed access to the site on that date.

### Conclusions of Law

The Miller Act, upon which this litigation is founded, provides at 40 U.S.C. § 270b(b):

"Every suit instituted under this section shall be brought in the name of the United States for the use of the person suing, in the United States District Court for any district in which the contract was to be performed and executed and not elsewhere, irrespective of the amount in controversy in such suit, *but no such suit shall be commenced after the expiration of one year after the day on which the last of the labor was performed or material was supplied by him.* The United States shall not be liable for the payment of any cost or expenses of any such suit." (Emphasis added).

Thus, pursuant to statute, plaintiff was required to commence its suit within one year after the date on which its last labor or materials was furnished.

If plaintiff gained any access to the site at all on August 22, 1989, which appears unlikely, it was only for the purpose of making an attempt to belatedly correct its own defective welding work, a task for which the services of Greiner Erection Company had by that date already been engaged by Barton & Barton.

In any event, neither the inspection of work already installed nor correction of defective work will extend the statutory period for bringing an action under the Miller Act. *United States v. Schaefer Sons, Inc. and Royal Indemnity Company*, 272 F.Supp. 962 (E.D.N.Y.1967). The furnishing of material for the purpose of correcting or repairing defects in work already done does not toll the notice provisions of the Miller Act, *United States v. EJT Construction Company, Inc.*, 517 F.Supp. 1178 (E.D.Pa.1981). Specifically, in *Schaefer, supra,* at pp. 963–964, the Court stated the following:

■ While the Miller Act is to be liberally construed in order to protect those whose labor and materials go into public projects, a court cannot disregard the clearly expressed limitation contained in Section 270b(b). *United States ex rel. Austin v. Western Elec. Co.*, 337 F.2d 568, 572 (9th Cir.1964); *United States ex rel. Charles R. Joyce & Son v. F.A. Baehner, Inc.*, 326 F.2d 556 (2d Cir.1964). Neither the inspection of work already installed, nor the correction of defective work, will extend the statutory period. *United States ex rel. Austin v. Western Elec. Co., supra* at 572–573; *United States ex rel. Circle–L–Elec. Co. v. Hyde Construction Company*, 255 F.Supp. 335, 342 (N.D.Okla.1964); *United States ex rel. McGregor Architectural Iron Co. v. Merritt–Chapman & Scott Corp.*, 185 F.Supp. 381, 383 (M.D.Pa.1960).

Thus, even assuming that plaintiff did return to the site on August 22, 1989, and did at that time furnish materials for correction of its own defective welds, a proposition which the court is unable to accept on the evidence herein, nevertheless, the mere furnishing of materials for the purpose of correcting or repairing defects in the welds would not toll or extend the time

for filing a Miller Act claim. Therefore, since plaintiff's claim was filed approximately two years after the date of its last work, plaintiff's claim must be dismissed, and a judgment of no cause for action granted. This holding renders defendant's counterclaim herein moot.

IT IS SO ORDERED.