**UNITED STATES of America for the Use and Benefit of HUSSMANN CORPORATION, Plaintiff,**

v.

**FIDELITY AND DEPOSIT COMPANY OF MARYLAND, Defendant.**

**Civil Action No. 97–2559.**

United States District Court, D. New Jersey.

March 30, 1998.

Pitney, Hardin, Kipp & Szuch by Stephen G. Traflet, Elizabeth J. Sher, Morristown, NJ, for Plaintiff.

Stark & Stark by Lewis Pepperman, Michael A. Iaconelli, Princeton, NJ, for Defendant.

**OPINION**

IRENAS, District Judge.

Plaintiff Hussmann Corporation ("Hussmann"), a subcontractor, instituted this suit pursuant to the Miller Act, 40 U.S.C. § 270a et seq., against defendant Fidelity & Deposit

Company of Maryland ("Fidelity & Deposit"), the surety for C. Pyramid Enterprises, Inc. ("C. Pyramid"), the general contractor on a federal government contract. The Miller Act is federal legislation that provides a remedial cause of action for contract disputes involving federal building projects. Both Hussmann and Fidelity & Deposit have moved for summary judgment. Because we find that Hussmann's Miller Act claim is timely and that there are genuine issues of material fact regarding Hussmann's entitlement to payment from Fidelity & Deposit as surety for C. Pyramid, we will deny both parties' motions for summary judgment and allow this case to proceed to trial.

## I. BACKGROUND

On July 1, 1994, the Defense Commissary Agency, AETC/LGCR Contracting Squadron ("DeCA") issued an Invitation For Bid ("IFB"), soliciting the services of prime contractors for the construction, renovation and complete alteration of a new supermarket to be built within the Commissary building at McGuire Air Force Base in Wrightstown, New Jersey (the "Commissary"). Craddock Aff. at ¶8; Exh. A to Craddock Aff. The supermarket was to be a large facility with over twenty check-out counters. St. Lawrence Aff. at ¶5. Building the new supermarket required new renovations to an existing Commissary facility and the installation of a new product refrigeration system within the facility itself. Craddock Aff. at ¶7.

In response to DeCA's IFB, C. Pyramid prepared and submitted an August 23, 1994 bid to perform the construction, renovation and complete "refitting" of the supermarket within the Commissary. Craddock Aff. at ¶11; Exh. C to Craddock Aff. As C. Pyramid was the lowest responsible bidder, DeCA issued a Notice of Award to C. Pyramid for the Commissary project on October 12, 1994. Exh. D to Craddock Aff. C. Pyramid thereafter became the prime contractor on BBA Project Number 795.04 (the "Government Contract"). As required by § 270a of the Miller Act, Fidelity & Deposit became C. Pyramid's payment and performance surety. Craddock Aff. at ¶2.

After C. Pyramid was awarded the Government Contract, Mark Craddock, C. Pyramid's Senior Vice President, began negotiating the terms of an agreement for the design, engineering, and manufacturing of all refrigeration equipment to be installed at the Commissary with representatives of Tyler Refrigeration, Hill Refrigeration and Hussmann. Craddock Aff. at ¶13. As a result of Hussmann's 60 years of experience in the refrigeration industry and C. Pyramid's belief that Hussmann would best be able to provide technical support and consulting guidance, C. Pyramid chose to use Hussmann as the supplier of refrigeration equipment needed under the Government Contract. Craddock Aff. at ¶15.

On October 27, 1994, C. Pyramid and Hussmann entered into a written agreement in the form of a purchase order (the "Purchase Order") whereby Hussmann agreed to supply certain commercial refrigeration equipment to C. Pyramid for the price of $700,000. Smith Aff. at ¶5. The Purchase Order states, and the parties essentially agree, that Hussmann's contractual obligations included the design and manufacturing of (1) the product refrigeration system, (2) the refrigeration unit coolers, (3) the air cool condensers, (4) the compressor systems, (5) the insulated cold storage rooms, and (6) a refrigeration monitoring system. Purchase Order, Exh. E to Craddock Aff. The parties dispute, however, whether Hussmann had any further obligations pursuant to the Purchase Order.

Hussmann shipped the refrigeration equipment specified in the Purchase Order directly to the Commissary, care of C. Pyramid, as required under the Purchase Order. The equipment was shipped on the following dates:

| | |
|---|---|
| Racks/Refrigeration Machines | March 31,1995 |
| Condensing Units | April 19, 1995 |
| Coolers | September 13, 1995 |
| Cases | April 25, 1995 |
| | September 13, 1995 |
| | October 6, 1995 |
| | November 14, 1995 |
| Evaporator Coils | February 14, 1995 |
| Condensers/Roof Equipment | April 5, 1995 |
| Comtrol Controls | May 4, 1995 |
| Miscellaneous Buyouts | November 8, 1995 |

Craddock Aff. at ¶46; May 31, 1996 letter from Hussmann to DeCA, Exh. C to Supp.

Smith Aff. Thus, the last refrigeration equipment shipped by Hussmann, a delivery of cases, was shipped on November 14, 1995. Although it is unclear from the record on what date the government began operating the refrigeration system, it appears that by June 13, 1996, 90% of the system was in operation. June 13, 1996 Letter from Craddock to Smith, Exh. F to Craddock Aff.

In the summer of 1996, C. Pyramid requested the close-out items under the Purchase Order. Hussmann states that close-out items are typically provided as the final step in an "Equipment Only" job, and claims that under the Purchase Order, the close-out items consisted of operation and maintenance ("O & M") manuals for the refrigeration equipment, final drawings of the refrigeration equipment as installed at the Commissary, and on-site equipment service and maintenance training. Smith Aff. at ¶ 11. Fidelity & Deposit disputes that the supply of close-out items comprised the final step of the Purchase Order. Although the Purchase Order does not expressly state that O & M manuals or any other close-out items must be supplied as the final step under the contact, it does include a provision referencing a specification of the Government Contract which discusses operating and maintenance instructions. The first page of the Purchase Order states "ALL MATERIALS TO CONFORM TO SPEC. SECTIONS" followed by various specification section numbers. One of the numbers listed, 15688, has a section, " § 1.06. Operating and Maintenance Instructions," which details the operating and maintenance instructions required by the government. Section 1.06 states:

A.... The instructions shall include, but shall not be limited to, the following:

1. System layout showing piping, valves, and controls. One set of reproducible (mylar type) Record Drawings shall be provided for local engineer files, one set shall to [sic] go to HQ DeCA/ DFDM

2. Approved wiring and control diagrams with data to explain the detailed operation and control of each component. Include interface and connection to the refrigeration monitoring control systems (RCMS).

3. A control sequence describing system start-up, operation and shut-down.

4. Operating and maintenance (including lubrication) instructions for each piece of equipment.

5. Display case manufacturer's bulletins, catalogue cuts and descriptive data, installation and operation data.

6. Parts lists and recommended spare parts.

7. Warranty certificates for compressors, display cases, etc. including procedures for getting warranty items replaced.

8. Approved pressure control settings, refrigeration schedule and refrigeration circuit layout drawings of the entire system and layout drawings on RCMS, framed under laminated plastic, shall be posted, in the Refrigeration Equipment Room where directed by the Contracting Officer. Drawings shall be fixed so that they will not fade. The framed drawings shall be posted before acceptance testing of the systems.

B. Instructions to Contracting Officer's representatives: The instruction shall be conducted within 45 days after final acceptance of the system. The instruction (8 hrs) shall be conducted at the commissary by the display case manufacturer....

Exh. B to Hussmann Reply Br.

In a letter dated July 17, 1996 and addressed to Hussmann Contract Administrator Jack Brown, C. Pyramid Project Coordinator Ray Muller requested that Hussmann provide the project close-out items, specifically referencing the O & M manuals and operating instructions as per spec. number 15688:

It is now approximately 45 days prior to completion of our contractual work and therefore we request that all manuals and operating instructions etc. as per Spec. sect. 15688–4 [ § 1.06] Par. A and B, be submitted.... Jack, it is important that you confirm in writing, your forwarding of manuals, and a date when you intend to hold instructional period so that personal

[sic] who will be responsible for maintenance and operation can be made available. Supp. Smith Aff. at ¶ 13; Exh. G to Supp. Smith Aff. On the same day, July 17, 1996, Mr. Smith sent a response letter to Mr. Muller stating that "Hussmann is prepared to provide the project close-out services to you as soon as the items of payment, warranty claims and final payment to Hussmann can be agreed upon." Supp. Smith Aff. at ¶ 14, Exh. H to Supp. Smith Aff.

On July 18, 1996, Mark Craddock of C. Pyramid sent a letter to Dave Smith of Hussmann stating:

> We have always maintained that to date, we have never received all materials required by the contract, and your personnel continue to promise us that all materials are firth coming [sic].... C. Pyramid's procurement of these products will fall under ¶ 8 Remedy for Delays and Default.... Additionally, you are responsible for services under this contract. Your refusal to provide O & M Manuals and training as set forth in the contract due to a dispute over cost and backcharges or trying to force us to settle under your terms will not be tolerated by C. Pyramid Enterprises Inc.

Exh. I to Supp. Smith Aff.; Supp. Smith Aff. at ¶ 15. By letter dated July 22, 1996, Mr. Smith responded to Mr. Craddock's letter, stating:

> We *have not refused* to provide any material required by the construction documents. To date, we have not received an official punch list with a list of deficiencies or shortages.
>
> We have not received field mark-up of shop drawings for as built drawing preparation. (A part of O & M manuals) ...
>
> In order for Hussmann to provide the project close-out materials/services, we will require the following at your earliest convenience:
>
> 1. Marked shop drawings indicating Field Changes
>
> 2. Date for training (if Hussmann is to pick dates, please advise)
>
> 3. Payment for a substantial portion of your account balance....

> We have given our full support to you on this project and nothing that we have done has served to jeopardize the completion of this project.... It is our desire to see that this project is brought to a successful completion, but it is your company that is in default in its obligations to Hussmann, and if necessary, Hussmann will pursue legal options available to us to see that we are fully paid.

Exh. I to Supp. Smith Aff. On September 9, 1996, Mr. Craddock sent Mr. Smith a letter purporting to "summarize the present status of [C. Pyramid's] backcharges and payment withholdings" totaling $81,239.54 on the Commissary project. Among Mr. Craddock's itemized list were:

4. O & M Manuals and Drawings    $5,000.00

Exh. L to Craddock Aff. Mr. Craddock then stated: "It is strongly recommended that you complete all of your contractual obligations ASAP in order that government acceptance takes place." *Id.*

Hussmann alleges it shipped six sets of O & M manuals and its final drawings, without receiving payment of the outstanding sum, to C. Pyramid on September 16, 1996. Smith Aff. at ¶ 13; Exh. D to Smith Aff. A letter dated September 16, 1996 addressed to Ray Muller's attention stated: "Per your direction, Hussmann Corp. is sending 6 sets of 'O & M' Manuals for equipment furnished by Hussmann...." Exh. D to Smith Aff. The letter also states that "As Built" marked shop drawings were being sent per C. Pyramid's instructions. *Id.* C. Pyramid claims that the manuals were sent to DeCA's private management company's on-site representative, Muller Aff. at ¶ 9, and that C. Pyramid never received them at either its corporate headquarters or at the Commissary facility. Craddock Aff. at ¶ 53. Hussmann claims C. Pyramid did receive the manuals, relying on a September 18, 1996 letter, written on C. Pyramid stationery with no addressee, which states "Received ... C. Pyramid Enterprises, six copies of operation and Maint. books and drawings for the Hussmann refrigeration equipment." Exh. E. to Smith Aff.

C. Pyramid considered the last materials under the Purchase Order to have been de-

livered on November 14, 1995. Craddock Aff. at ¶ 55; Muller Aff. at ¶ 12. Even though O & M manuals and final shop drawings were delivered on September 16, 1996, C. Pyramid did not view them as materials or goods under the Purchase Order. Muller stated in his affidavit that:

6. The Operation and Maintenance ("O & M") Manuals referenced in ¶ 11 of the Smith Affidavit were *not* "materials or goods" that were supplied by Hussmann to enable C. Pyramid to install the Hussmann manufactured equipment at the Commissary.

7. The O & M Manuals referenced in the September 16, 1996 correspondence from Hussmann to C. Pyramid (author unknown), (annexed as Exhibit "D" to the Smith Affidavit), can *only* be characterized as items intended to either (1) remediate manufacturing defects in the refrigeration equipment previously supplied by Hussmann to C. Pyramid, or (2) to repair system errors in the Hussmann refrigeration equipment after C. Pyramid's completion of the installation aspect of the project at the Commissary.

8. It is universally accepted throughout the entire industry that O & M Manuals of the nature involved in this case are items of "user maintenance," intended to "remediate or cure" defects and errors in originally manufactured and previously installed equipment.

Muller Aff. at ¶ 6–8. Similarly, Mr. Craddock testified that:

52. The six (6) sets of "Refrigeration Manuals" and "Catalog Cuts Manuals" that Hussmann refers to in ¶ 11–14 of the Smith Affidavit were not "materials or goods" that were supplied by Hussmann to enable C. Pyramid to install the Hussmann manufactured equipment at the Commissary, but instead, were only shipped to either (1) remediate manufacturing defects in the refrigeration equipment *previously* supplied by Hussmann to C. Pyramid, or (2) to repair system errors in the Hussmann refrigeration equipment, *after* C. Pyramid's completion of the installation as-

pect of the project, as per the terms of the Government Contract.

Craddock Aff. at ¶ 52.

C. Pyramid likewise discounted the receipt of the final shop drawings. C. Pyramid claims the shop drawings were merely duplicates of drawings supplied to C. Pyramid much earlier. Allegedly the final shop drawings had already been prepared by Hussmann in December of 1994, and had been shipped to C. Pyramid in their identical condition well before February 14, 1995. Craddock Aff. at ¶ 54; Muller Aff. at ¶ 11. Fidelity & Deposit claims the drawings were not supplied by Hussmann on September 16, 1996 for the first time, but were instead delivered to DeCA representatives to correct defects in the already installed equipment. Craddock Aff. at ¶ 55; Muller Aff. at ¶ 12. It is not disputed that the value of the O & M manuals and final drawings is $5,000. Craddock Aff. at ¶ 56.

Hussmann alleges that C. Pyramid's outstanding balance under the Purchase Order is $79,397 calculated as follows:

$24,018 under Hussmann Invoice No. 90568 dated September 25, 1995.

$640 under Hussmann Invoice No. 91383 dated November 15, 1995

$54,739 under Hussmann Invoice No. 91327 dated November 15, 1995.

Smith Aff. at ¶ 16. C. Pyramid argues that its own claims for recoupment for alleged breaches and negligence exceed any sums it might owe Hussmann.

On October 29, 1996, not having received the outstanding balance it alleged was due, Hussmann provided notice of its claim against C. Pyramid's payment bond to Fidelity & Deposit and to C. Pyramid. Smith Aff. at ¶ 15; Exh. F to Smith Aff. On October 30, 1996, C. Pyramid employee Wayne Norman sent a handwritten facsimile to Mr. Smith stating: "I would like [to] settle the backcharges to finalize this contract. Is Friday a good time to talk about it? Let me know[.]" Supp. Smith Aff. at ¶ 22; Exh. K to Supp. Smith Aff.

On December 18, 1996, DeCA terminated C. Pyramid from the Commissary renovation job. Smith Aff. at ¶ 17; Lawrence Aff. at

¶ 12; Craddock Aff. at ¶ 37. DeCA began issuing complaints about some of the refrigeration equipment, in particular the ELL piping, in June of 1996. *See* June 6, 1996 Memo to C. Pyramid from Sharon Cooper, DeCA's Contracting Officer, Exh. H to Craddock Aff. In the fall of 1996, DeCA had more complaints. On October 31, 1996, it issued a facsimile forwarding a printout from the Refrigeration Monitor and Control System which showed various problems, some of which had been recurring. *See* October 31, 1996 Facsimile to C. Pyramid from DeCA, Exh. N to Craddock Aff. In January, 1997, DeCA hired Virginia Refrigeration, Inc. to complete and correct the refrigeration installation work at the Commissary. Smith Aff. at ¶ 17; Lawrence Aff. at ¶ 4.

C. Pyramid alleges that Hussmann breached several of its contractual obligations under the Purchase Order and that these breaches caused DeCA to deny it permission to complete the Commissary project. It claims that pursuant to sections 4 and 14 of the general conditions governing the Purchase Order,[1] Hussmann was obligated to warranty its equipment and provide field support services during installation in order to insure conformance with the explicit terms of the Government Contract. C. Pyramid has been assessed $81,239.54 in backcharges by DeCA; it alleges these backcharges were caused because of Hussmann. Craddock Aff. at ¶ 33; Exh. L to Craddock Aff. The total expenses C. Pyramid claims it has incurred as a result of Hussmann's breaches allegedly amount to $ 456,955.13. Craddock Aff. at ¶ 38. C. Pyramid asserts the following breaches:

(a) Hussmann failed to provide "start-up and support" assistance;

(b) Hussmann failed to provide a "piping schematic" to properly depict the Commissary's existing limitations and physical conditions;

(c) Hussmann failed to provide adequate and timely support personnel to "startup" its equipment and to inspect and approve the installation measures employed by C. Pyramid's installations subcontractor after each phase of the refrigeration system completed at the site;

(d) Hussmann failed to properly perform "quality control" measures in connection with its manufacturing of the refrigeration equipment;

(e) Hussmann failed to provide C. Pyramid with a list of corrective measures to be taken by C. Pyramid or its installation subcontractor to address the problems experienced at the Commissary with Hussmann's faulty equipment;

(f) Hussmann failed to perform proper field measurements to insure that the design and engineering specifications it provided to C. Pyramid per the Agreement were adequate in light of the unique na-

---

1. Section 4 provides:

QUALITY AND DESIGN OF PRODUCT OR SERVICES:

b. Articles furnished hereunder shall be of new material of the most suitable grade of their respective kind for the purposes intended and Vendor [Hussmann] warrants all to be free from defect in materials, design and workmanship.

c. All services furnished hereunder by Vendor are to be performed by qualified, careful and efficient mechanics in the best and more workmanlike manner and in exact accordance with the provisions hereof.

d. Vendor [Hussmann] shall verify *in the field* and be responsible for all measurements, dimensions, layouts, colors, qualities, quantities, etc. insofar as same are pertinent to the articles or services furnished hereunder. Vendor shall replace at its own cost and expense defective items, articles, services, etc. furnished hereunder and shall indemnify Vendee [C. Pyramid] for any costs or expenses attributable to errors, in Vendor's performance. *Approval of shop drawings shall not relieve Vendor [Hussmann] from responsibility for field measurements and compliance with field conditions.* (emphasis added)

e. Vendor shall furnish samples, shop drawings, certificates, affidavits, reports, or any other written or physical data that may be required by the Vendee for the proper performance hereunder.

Section 14 provides:

GOVERNMENT AGENCIES:

a. If any article or services furnished hereunder will be for the use of the United States Government or any State or Local Governmental Agency, under a contract with the Vendee [C. Pyramid], then said article or service shall conform to the Government contract drawings and specifications and all terms, provisions, and conditions of the principle contract between the Government and the Vendee shall apply hereto as if set forth at length herein.

ture of the project being classified as a "re-fit" or "add/alter" project; and

(g) Hussmann improperly approved the use and implementation of 45 degree ELL piping at the Commissary despite Hussmann's awareness that the nature of the project involved "over-crowded" mechanical rooms that supported an existing refrigeration system.

Craddock Aff. at ¶ 22.

C. Pyramid claims it communicated these breaches to Hussmann both orally and in writing. *Id.* at ¶ 24. Nonetheless, it alleges, Hussmann failed to dispatch the necessary support personnel to the Commissary each time they were needed. *Id.* at ¶ 25. Only on two occasions was a Hussmann representative sent to attend to alleged problems. *Id.* at ¶ 25. During one of these visits, C. Pyramid claims Hussmann representatives Steven Wood and David Smith inspected the installation work performed by Eveready, C. Pyramid's subcontractor, and indicated that no corrective action would need to be taken to insure the proper functioning of the entire system. *Id.* at ¶ 26. On June 13, 1996, in response to a letter directed to DeCA in which Hussmann requested the government's intervention in receiving payment for C. Pyramid, C. Pyramid's Senior Vice President Mark Craddock sent Dave Smith, then Hussmann's manager of Contract Sales, a letter explaining why outstanding sums had not been paid:

After repeated calls by our field people, as well as our office, for parts that were either missing or broken in shipment and or not properly working after installation, we are now in a stand off by your personnel regarding supplying the necessary components to finish our work.

This has led to lost product by the Commissary as well as increased cost to us unloading cases additional of hour response time. We have also developed additional costs due to manufacturers defects, such as wrong transformers on racks, burnt out controll [sic] boards, and boards that were never programmed as defined in the contract. Additionally, both C. Pyramid Enterprises, Inc. and the DeCA are disappointed with Hussmann's

lack of attentiveness to come to the project as these systems were put on line. This is clearly defined in your contract to provide case manufacture representative on site. To date you have only sent a representative to the site once last November.

... [W]e request that you immediately send a technician to the site from Hussmann and schedule Comptrol Tech to be there with him to finally resolve the settings for the controll [sic] system.

You keep questioning about payment ... It is not unusual to retain 10% of monies from each vendor on a government contract, with manufacturing defects, missing material and no factory support.

... We therefore implore you to please cooperate with us in a joint effort that may complete our work at the McGuire Commissary in a timely manner, collect our outstanding monies, pay you and also continue to do future business with your firm.

Exh. D to Supp. Smith Aff. Similar complaints were made periodically thereafter.

Hussmann claims that throughout the installation process, which took place approximately between mid–1995 and late–1996, it provided extensive technical assistance via telephone, correspondence and site visits. Smith Aff. at ¶ 10. It also argues that the Purchase Order clearly obligates it to provide "EQUIPMENT ONLY" and that therefore it was not responsible for providing services. Supp. Smith Aff. at ¶ 4. The Purchase Order is expressly marked in two places "EQUIPMENT ONLY!" and "EQUIPMENT ONLY!!!!" *Id.* Attached to the purchase order and specifically incorporated therein is a "Scope of Proposal," which further specified the equipment to be supplied by Hussmann, and likewise stated on top and throughout in all capitals: "EQUIPMENT ONLY." *Id.* As further evidence of the parties' contractual intent to limit Hussmann's obligations to the provision of "equipment only," Hussmann has submitted to the Court two initial proposals which provided for installation and field support services by Hussmann and which were summarily rejected by C. Pyramid. *Id.* at ¶ 3–4. Hussmann also points out that C. Pyramid hired Eveready to provide just these types of services. *Id.* at

¶ 8. It alleges that any costs incurred by C. Pyramid as a result of problems in the refrigeration system must be attributed to Eveready's negligent installation, not Hussmann equipment. Hussmann informed C. Pyramid of its position in a June 14, 1996 letter from Smith to Craddock. Exh. F to Supp. Smith Aff. As to the outstanding payment issues, Smith concluded the letter by stating: "I don't feel it is unreasonable to insist for immediate payment before we can proceed with the parts and technical assistance ... we too are interested in an amicable solution which benefits C. Pyramid, DeCA, and Hussmann.... I look forward to discussing resolution of the problems with you or your representative." *Id.* Hussmann informed C. Pyramid on July 16, 1996 that "all charges in which Hussmann may be remotely responsible for totals $ 2,595. I must receive the appropriate information for any items I agree to pay for." Exh. K to Craddock Aff.

. On December 12, 1996, C. Pyramid filed suit against Hussmann for its alleged breach of the contract and negligence in the Mercer County Superior Court. Hussmann counterclaimed against C. Pyramid for its failure to pay Hussmann in full for materials supplied pursuant to the Purchase Order. Hussmann then filed the present Miller Act action against C. Pyramid's surety, Fidelity & Deposit, in this Court on May 12, 1997.

## II. DISCUSSION

The Miller Act, 40 U.S.C. § 270a et seq., allows persons furnishing labor or material in furtherance of a contract for the construction, alteration or repair of a public building of the United States to bring suit for the unpaid amount or balance due under the contract. 40 U.S.C. § 270b(a). Actions under the Miller Act must be brought in the name of the United States for the use of the person suing. 40 U.S.C. § 270b(b). Courts should "liberally construe" the Miller Act to effectuate Congressional intent to provide security to persons contributing labor and material to public works projects. *See United States for Use and Benefit of T.M.S. Mechanical Contractors, Inc. v. Millers Mut. Fire Ins. Co. of Texas,* 942 F.2d 946, 950, n. 9

(5th Cir.1991) (quoting *Standard Accident Ins. Co. v. United States ex rel. Powell,* 302 U.S. 442, 444, 58 S.Ct. 314, 82 L.Ed. 350 (1938)); *United States ex rel. Martin Steel Constructors Inc. v. Avanti Constructors, Inc.,* 750 F.2d 759, 761 (9th Cir.1984) (citing *F.D. Rich Co. v. United States ex rel. Indus. Lumber Co.,* 417 U.S. 116, 124, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974.)), *cert. denied sub nom. Harvis Constr., Inc. v. United States ex rel. Martin Steel Constructors, Inc.,* 474 U.S. 817, 106 S.Ct. 60, 88 L.Ed.2d 49 (1985); *United States ex rel. Charles R. Joyce & Son, Inc. v. F.A. Baehner, Inc.,* 326 F.2d 556, 557 (2d Cir.1964).

■ To establish a prima facie case, a material supplier must prove four elements:

(1) the materials were supplied in prosecution of the work provided for in the contract;

(2) the materialman has not been paid;

(3) the materialman had a good faith belief that the materials were intended for the specified work; and

(4) the jurisdictional requisites were met. *Martin Steel Constructors, Inc.,* 750 F.2d at 761 (citations omitted); *see United States for Use and Benefit of Balzer Pacific Equip. Co. v. Fidelity and Deposit Co. of Md.,* 895 F.2d 546, 550 (9th Cir.1990); *Canion v. Randall & Blake,* 817 F.2d 1188, 1191 (5th Cir.1987); *ACC Roofing, Inc. v. Dix & Sons Constr. Co.,* 1991 WL 224066, *2 (E.D.Pa.1991); *Pittsburgh Builders Supply Co. v. Westmoreland Constr. Co.,* 702 F.Supp. 106, 108 (W.D.Pa. 1989). Before proceeding to an analysis of the first three elements, we must first determine whether or not the jurisdictional requisites have been met in order to satisfy the fourth element. At issue here is whether Hussmann has met the jurisdictional requirement of the Miller Act's one-year statute of limitations for filing a claim against a surety. 40 U.S.C. § 270b(b). The parties have hotly debated this point; if the jurisdictional requisites have not been met, Hussmann's Miller Act claim would have to be dismissed as untimely. According to Hussmann, its May 12, 1997 claim is timely because the date upon which the statute began running is September 16, 1996, when it delivered O & M manuals and final as-built shop drawings.

Fidelity & Deposit, to the contrary, alleges that Hussmann's claim is untimely, arguing that the one-year statute began running on November 14, 1995, the date upon which the last of the Hussmann cases were delivered to C. Pyramid.

### A. The Miller Act and the Act's Statute of Limitations

The Miller Act, 40 U.S.C. § 270b, provides a federal cause of action for persons supplying labor and materials upon a payment bond secured by the principal contractor of a federal government project. Section 270b provides for a one-year period within which a Miller Act must be brought. Federal courts have struggled to ascertain the precise date for running the Miller Act's one-year statute of limitations. The language of the statute provides that the proper date is "the day on which the last of the labor was performed or material was supplied." 40 U.S.C. § 270b(b). The Miller Act's original statute of limitations running mechanism was the "date of final settlement." *See United States for Use of T.L. Wallace Constr., Inc. v. Fireman's Fund Ins. Co.*, 790 F.Supp. 680, 684 (S.D.Miss.1992) (quoting 1959 U.S.Code Cong. & Admin. News, at 1995–2000); *United States for the use of H.T. Sweeney & Son, Inc. v. E.J.T. Constr. Co., Inc.*, 415 F.Supp. 1328, 1330–31 (D.Del.1976). Apparently, Congress amended the Miller Act in 1959 to adopt the performance-and-supply language to "provide 'a simple, fixed and certain method' for determining the time period within which to file suit." *T.L. Wallace Constr.*, 790 F.Supp. at 684 (quoting 1959 U.S.Code Cong. & Admin. News, at 1996). Despite this legislative clarification, the 1959 amendment has not entirely ended the debate regarding the timing of tolling.

The Third Circuit has not spoken squarely on the requirements for the running of the Miller Act's one-year statute of limitations. There appear to be essentially two distinct methodologies among the circuits for determining the date when the Miller Act's statute of limitations begins to run: (1) upon completion of the original requirements of the contract (as opposed to completion of "corrections or repairs"), and (2) upon substantial completion of a subcontract.[2]

### 1. The Majority View: Provision of the Contract v. Correction or Repair

The majority rule holds that remedial or corrective work or materials, or inspection of work already completed, does not fall within the meaning of "labor" or "materials" and will not extend the Miller Act's one-year limitations period. *See, e.g., United States for the use of Magna Masonry, Inc. v. R.T. Woodfield, Inc.*, 709 F.2d 249, 250 (4th Cir. 1983); *United States for the use of State Elec. Supply Co. v. Hesselden Constr. Co.*, 404 F.2d 774, 776 (10th Cir.1968); *United States ex rel. Austin v. Western Elec. Co.*, 337 F.2d 568, 572 (9th Cir.1964); *United States for Use of Mod–Form v. Barton & Barton Co.*, 769 F.Supp. 235, 238 (E.D.Mich. 1991), *aff'd without opinion*, 966 F.2d 1453 (6th Cir.1982); *United States for the use of Billows Elec. Supply Co. v. E.J.T. Constr. Co., Inc.*, 517 F.Supp. 1178, 1181 (E.D.Pa. 1981), *aff'd*, 688 F.2d 827 (3d Cir.), *cert. denied*, 459 U.S. 856, 103 S.Ct. 126, 74 L.Ed.2d 109 (1982).

The majority rule is espoused in its most well known form in a 1964 opinion of the Ninth Circuit. In *United States for Use of Austin v. Western Electric Co.*, 337 F.2d 568, 572–73 (9th Cir.1964), the Ninth Circuit adopted a bifurcated test for determining when work performed or materials supplied will toll the statute of limitations under the Miller Act, and when the supply of such work or materials has no effect on the running of the statute. *Id.* at 572–73. The Ninth Circuit's inquiry in *Western Electric Co.* focused on the nature of the work performed or materials supplied to determine whether it was more properly characterized as an uncompleted requirement of the original subcontract, or as a mere correction or repair of an already performed provision of the original subcontract. *Id.* The court held that correction or repair materials and labor would not toll the running of the statute, but

---

**2.** *See United States ex rel. Luis A. Cabrera v. Sun Eng'g Enters., Inc.*, 817 F.Supp. 1009, 1013–15 (D.P.R.) (discussing split between the circuits on appropriate test), *aff'd without opinion*, 10 F.3d 805 (1st Cir.1993).

that the furnishing of labor or materials pursuant to a requirement of the original subcontract would toll the running of the statute. *Id.*

A majority of the circuits agree with the Ninth Circuit's correction-or-repair versus original-contract test. *See United States ex rel. Luis A. Cabrera v. Sun Eng'g Enters., Inc.,* 817 F.Supp. 1009, 1013–15 (D.P.R.) (discussing which circuits follow *Western Electric Co.* test), *aff'd without opinion,* 10 F.3d 805 (1st Cir.1993). The Fourth Circuit has explicitly adopted the correction-or-repair versus original-contract test. *See United States for the Use of Magna Masonry, Inc. v. R.T. Woodfield, Inc.,* 709 F.2d 249, 251 (4th Cir.1983); *see also United State for Use of Noland Co. v. Andrews,* 406 F.2d 790, 792 (4th Cir.1969) (applying the same standard to the Miller Act's 90-day notice provision for subcontractors of subcontractors of the primary contractor). In *United States for Use of State Electric Supply Co. v. Hesselden Construction Co.,* 404 F.2d 774, 776 (10th Cir.1968), the same bifurcated inquiry became the rule of the Tenth Circuit. *See Bailey v. Faux,* 704 F.Supp. 1051, 1053 (D.Utah 1989). The Eighth Circuit's approach is similar to the majority rule in substance, but asks a different question. The Eighth Circuit determines the date upon which the Miller Act statute of limitations begins by ascertaining the date upon which the subcontractor would be able to bring a valid contractual claim against the general contractor. *See United States for Use of General Elec. Co. v. Gunnar I, Johnson & Son, Inc.,* 310 F.2d 899, 903 (8th Cir.1962). Claims may be brought once the requirements of the original subcontract have been performed, despite the fact that subsequent remedial or corrective measures may be necessary. Thus, as a practical matter, the statute begins to run at the same time as it does under the correction-or-repair versus original-contract test. *Cf. United States ex rel. Olson v. W.H. Cates Constr. Co.,* 972 F.2d 987, 991 (8th Cir.1992) (stating that Miller Act does not apply unless plaintiff can show that his work was "performed ... in connection with the completion of the project and not for the purpose of correcting defects"

and citing *Western Elec. Co.,* 337 F.2d at 572–73).

District courts in this Circuit also have applied the correction-or-repair versus original-contract test in analyzing the Miller Act's statute of limitations running mechanism. In a case predating the famous *Western Electric Co.* case, the Middle District of Pennsylvania adopted the majority view, stating the rationale for this view as follows:

> If plaintiff could extend the time ... by correcting a defect ... the time for such notice might remain in chaos and depend upon the discovery of defects in construction over a year or more after completion. ...

*United States ex rel. McGregor Architectural Iron Co. v. Merritt–Chapman & Scott Corp.,* 185 F.Supp. 381, 383 (M.D.Pa.1960). In *United States for Use of Billows Electric Supply Co. v. E.J.T. Construction Co.,* 517 F.Supp. 1178, 1181 (E.D.Pa.1981), *aff'd,* 688 F.2d 827 (3d Cir.), *cert. denied,* 459 U.S. 856, 103 S.Ct. 126, 74 L.Ed.2d 109 (1982), the district court held that the one year time period within which a Miller Act action must be instituted is measured from the last date that the subcontractor delivered materials to the job site which were included in the original construction contract. The court refused to toll the statute simply because repair or replacement items were delivered to the job site subsequent to the date upon which all the requirements of the original contract had been met. The court also found that the burden of proving that material last delivered to the job site was included in the construction contract (and/or a change order modifying the original contract) rests with the subcontractor. The Third Circuit affirmed the decision of the lower court, albeit without opinion. At least one district court in New Jersey has adopted the test set forth in *Billows Electric Supply, see United States For Use of E.J. and Sons, Inc. v. Viatech Sys., Inc.,* 1989 WL 109551, *2 (D.N.J. Sept. 20, 1989), and a district court in Delaware has also followed the majority rule, *United States for the use of H.T. Sweeney & Son, Inc. v. E.J.T. Constr. Co.,* 415 F.Supp. 1328, 1332 (D.Del.1976).

District courts, some of which have been affirmed without opinion, in the District of Columbia Circuit, the First Circuit, the Second Circuit and the Sixth Circuit have also followed the majority rule. *See United States for the Use of Lank Woodwork Co. v. CSH Contractors, Inc.*, 452 F.Supp. 922, 924 (D.D.C.1978); *United States ex rel. Luis A. Cabrera v. Sun Eng'g Enters., Inc.*, 817 F.Supp. 1009, 1013–15 (D.P.R.), *aff'd*, 10 F.3d 805 (1st Cir.1993); *United States for the use of Air Stream Prods. Co. v. Essential Constr. Co.*, 363 F.Supp. 681, 682 (S.D.N.Y. 1973) ("[T]he crucial question is not whether the final shipment is large or inconsequential, but rather whether it is made pursuant to an 'over-all contract.' "); *United States for Use and Benefit of T Square Equip. Corp. v. Gregor J. Schaefer Sons, Inc.*, 272 F.Supp. 962, 963–64 (E.D.N.Y.1967); *United States ex rel. Edwards & Co. v. Peter Reiss Constr. Co.*, 174 F.Supp. 264 (E.D.N.Y.), *aff'd*, 273 F.2d 880 (2d Cir.1959), *cert. denied*, 362 U.S. 951, 80 S.Ct. 864, 4 L.Ed.2d 869 (1960); *United States for Use and Benefit of Mod–Form v. Barton & Barton Co.*, 769 F.Supp. 235, 238 (E.D.Mich.1991) (test requires a determination of whether the work at issue is a "correction or repair" or "something required by the original contract"), *aff'd*, 966 F.2d 1453 (6th Cir.1992).

### 2. *The Minority View: Substantial Completion*

The Fifth Circuit and the Eleventh Circuit have a different test for determining when the one-year statute of limitations begins running in Miller Act cases. These jurisdictions follow the "substantial completion" rule in which the statute of limitations is not extended by insignificant work even if such work is required under the terms of the subcontract. *See Johnson Serv. Co. v. Transamerica Ins. Co.*, 485 F.2d 164, 172 (5th Cir.1973); *General Ins. Co. v. United States*, 406 F.2d 442, 443–44 (5th Cir.), *reh'g denied*, 409 F.2d 1326, *cert. denied sub nom, United States use of Audley Moore & Son v. General Ins. Co.*, 396 U.S. 902, 90 S.Ct. 214, 24 L.Ed.2d 178 (1969); *Trinity Universal Ins. Co. v. Girdner*, 379 F.2d 317 (5th Cir.

1967); *United States for the Use of T.L. Wallace Constr., Inc. v. Fireman's Fund Ins. Co.*, 790 F.Supp. 680, 684–85 (S.D.Miss.1992); *see also Luis A. Cabrera*, 817 F.Supp. at 1013–15 (discussing Fifth and Eleventh Circuits' minority view). Substantial completion does not incorporate corrections or repairs: the minority view coincides with the majority view that remedial work does not toll the statute; however, the minority view allows the statute to run when "insubstantial" subcontract requirements have not yet been completed. *See Southern Steel Co. v. United Pac. Ins. Co.*, 935 F.2d 1201, 1205 (11th Cir.1991); *Johnson Serv.*, 485 F.2d at 173; *General Ins. Co. v. United States*, 406 F.2d 442, 443–44 (5th Cir.), *reh'g denied*, 409 F.2d 1326, *cert. denied sub nom. United States use of Audley Moore & Son v. General Ins. Co.*, 396 U.S. 902, 90 S.Ct. 214, 24 L.Ed.2d 178 (1969).

### 3. *Another Approach: the Georgia Electric Factors*

We feel that the majority and minority views represent less of a distinct split among the circuits, and more of a difference of position along one continuum. On one end of the continuum is the strict enforcement of the repair versus original contract rule: regardless of the insignificance of the item supplied, if it is required by the original contact, its supply tolls the statute. On the other end of the spectrum is the literal application of the substantial completion test: whenever applicable contract law would deem substantial completion to have occurred, the supply of a contractually required item which the parties apparently felt was significant enough to be specifically provided for, does not toll the statute.

As a practical matter, we suspect that the majority and minority views often become conflated; the two ends of the spectrum tending to meet somewhere in the middle. A case demonstrating this is *Viscount Construction Co. v. Dorman Electric Supply Co.*, 511 A.2d 1102, 68 Md.App. 362 (1986).[3] In this case, the electrical subcontractor's supplier had furnished an inverter (a device for transforming direct current into alternating

---

**3.** This case was decided under Maryland's Little Miller Act.

current), but the inverter did not bear the contractually required Underwriter's Laboratory label of approval. Thereafter, the supplier furnished a satisfactory certificate, and the date of its delivery became the critical date. Despite the fact that delivery of the certification really just "corrected" the failure to deliver the certification earlier, the court found that, because the certification was a specified requirement under the original contract, it tolled the statute. The court's holding seems to support the repair versus original contract rule, but the court's rationale for its holding belies its consideration of the significance of the missing item notwithstanding the completion of the project: it found "the certification [to be] an absolutely essential part of the inverter," without which "the inverter is no more than a pile of useless matter...." *Id.* at 367, 511 A.2d at 1104.

■ We decline to adopt (or reject) either the majority view correction-or-repair versus original-contract test or the minority view substantial completion test. Instead, we gain assistance in making our statute of limitations determination by looking to a different methodology we feel nicely reflects the factors courts often consider while applying both the majority and minority views. Another approach, bearing similarities to both the majority view and the minority view (and thus supporting our continuum theory), is presented in *United States ex rel. Georgia Electric Supply Co. v. United States Fidelity & Guaranty Co.*, 656 F.2d 993 (5th Cir.1981). In this case, ballasts had been mistakenly omitted from the fluorescent lighting fixtures that had been installed in the project. Subsequently, the electrical subcontractor's supplier furnished the ballasts, and that date of delivery became the critical date for notice purposes. In the trial court a jury found for the plaintiff supplier, and the Fifth Circuit affirmed on that aspect of the case, after calling the issue "a close question." *Id.* at 996. The court advanced the following rationale:

> The line drawn by this Court and in other jurisdictions, whether the materials were furnished for repairs or as part of the original contract, is admittedly hazy. As

we noted in an earlier decision: '[E]ach case must be judged on its own facts and ... sweeping rules about "repairs" offer little help in the necessary analysis.' The factors to consider include the value of the materials, the original contract specifications, the unexpected nature of the work, and the importance of the materials to the operation of the system in which they are used.

*Id.* (quoting *Johnson Serv. Co.*, 485 F.2d at 173). This approach was also followed in *Southern Steel Co. v. United Pacific Insurance Co.*, 935 F.2d 1201, 1205 (11th Cir.1991), where the Court applied the *Georgia Electric* factors to find that summary judgment on the statute of limitations issue was inappropriate because the subcontractor deserved an opportunity to show that reworked locks supplied after project completion were needed as a result of faulty design or installation by a third party, not his own negligence. *Id.*

### 4. *Application of the Georgia Electric Factor*

As an initial matter, we note that Hussmann admits that the as-built final drawings were "duplicates of the initial shop drawings submitted by Hussmann at the outset of the Purchase Order." Supp. Smith Aff. at ¶ 20. As such, we cannot consider the delivery of such duplicates on September 16, 1996 for purposes of tolling the Miller Act one-year limitations period. Thus, we focus only on the O & M manuals delivered on that same date.

■ We now analyze the significance of the delivery of the O & M manuals under the *Georgia Electric* factors. The first *Georgia Electric* factor looks to the value of the materials. Here, the parties agree that the value of the O & M manuals is $5,000. Fidelity & Deposit claim that $ 5,000 is a trivial sum in comparison to the overall contract price of $ 700,000. We disagree. Although the $ 5,000 value of the O & M manuals represents only a small proportion of the overall contract price, $ 5,000 is still a significant amount of money. One recent Eastern District of Pennsylvania court, although not directly dealing with when to begin the Miller Act's running mechanism, has implied that

punch-list items and as-built final drawings valued at $ 392 could be recovered under the Miller Act. *United States for Use and Benefit of Joseph P. Sulzbach, Inc. v. Cottman Mechanical Contractors, Inc.*, 1993 WL 533114, 1993 U.S. Dist. LEXIS 18058 (E.D.Pa. Dec. 21, 1993). To be deemed too insignificant to constitute "materials" for statute of limitations purposes, the items would have to be valued at much less than $ 5,000. *See United States ex rel. Edwards & Co. v. Peter Reiss Constr. Co.*, 174 F.Supp. 264 (E.D.N.Y.) (delivery of switch valued at $15.90 not sufficient to be deemed materials for purposes of beginning the running of the Miller Act's 90–day notice period where total goods delivered under subcontract worth $10,766.27), *aff'd*, 273 F.2d 880 (2d Cir.1959), *cert. denied*, 362 U.S. 951, 80 S.Ct. 864, 4 L.Ed.2d 869 (1960). Thus, the first factor weighs in favor of beginning the one-year period from Hussmann's September 16, 1996 date.

The second factor looks to the original contract specifications. Here, government specification number 15688, § 1.06, incorporated on the first page of the Purchase Order, specifically provides for the provision of operating and maintenance instruction manuals. It is clear from the definition of § 1.06 that the manuals are relatively minor items of user instruction, intended to provide DeCA with operating and maintenance assistance for Hussmann's standard-type refrigeration equipment post-job completion. Although the definition of the operating instructions under § 1.06 demonstrates how dissimilar the manuals are to actual "materials supplied in prosecution of the work," 40 U.S.C. § 270b(a), their specific reference in the Purchase Order leans in favor of Hussmann's September 16, 1996 date.

The third factor, the "unexpected nature of the work," normally assists the court in determining whether the materials were more like repair items than original-contract items. Here, we are not convinced by Fidelity & Deposit's argument that the O & M manuals were repair-related items provided only to correct defects in the already installed Hussmann equipment. *See* Fidelity & Deposit Reply Br. at 9–10. Simply because a certain item contains instructions for repairing equipment does not mean that the item itself is a repair-item. To the contrary, instructions for operation and repair can be integral parts of a materials contract and their supply can be quite significant, even in terms of determining the proper statute of limitations date. *See U.S. for Use of Joseph T. Richardson, Inc. v. E.J.T. Const. Co., Inc.*, 453 F.Supp. 435, 440 (D.Del.1978) (hanging in dining hall of framed sequence of operations for environmental control system was part of original completion of dining hall project for Miller Act purposes so that performance of such labor within one year of bringing suit under Miller Act rendered claims under Act for work and materials supplied in connection with such project timely). Here, the delivery of the manuals was specifically provided for in the contract and Hussmann was obligated to deliver the manuals whether or not they were necessary to repair an "unexpected" equipment problem. Thus, by virtue of the terms of the contract and the manuals importance to those operating and repairing the system, we find that the manuals were an "expected" item. The third factor therefore weighs in favor of Hussmann's September 16, 1995 date.

The final factor, the importance of the materials to the operation of the system in which they are used, also supports Hussmann's September 16, 1996 date. Here, C. Pyramid itself admits, through its numerous letters to Hussmann demanding delivery of the manuals, that it considered the O & M manuals to be important. On July 16, 1996, Muller stated "it is now approximately 45 days prior to completion of our contractual work and therefore we request that all manuals and operating instructions etc. as per Spec. sect. 15688–4 Par A. and B. be submitted." Exh. G to Supp. Smith Aff. On July 18, 1996, Craddock wrote: "Your refusal to provide O & M Manuals and training as set forth in the contract due to a dispute over cost and backcharges or trying to force us to settle under your terms will not be tolerated by [C. Pyramid]." Exh. I to Supp. Smith Aff. On September 9, 1996 Craddock again demanded the manuals: "It is strongly recommended that you complete all your contractual obligations ASAP in order that the

government acceptance takes place." Exh. L to Craddock Aff. We feel these letters speak for themselves. Also revealing of C. Pyramid's view of the importance of the manuals is the fact that they based their refusal of payment on the fact that the manuals had not yet been delivered. Furthermore, C. Pyramid could not obtain government approval until the manuals had been delivered. Therefore, we feel the manuals were important to the operation of the system and therefore find that the final factor weighs in favor of the September 16, 1996 date.

Because we find that all of *Georgia Electric* factors clearly weigh in favor of running the one-year limitations period from Hussmann's September 16, 1996 date, we hold that Hussmann's claim is timely. Hussmann has therefore satisfied the fourth element, meeting the jurisdictional requirements, necessary to maintain a Miller Act claim.

### B. *Satisfaction of the Other Three Elements of a Miller Act Claim*

Having determined that Hussmann's Miller Act claim is timely, we must now proceed to an analysis of its satisfaction of the other three elements necessary to succeed on a Miller Act claim:

(1) the materials were supplied in prosecution of the work provided for in the contract;

(2) the materialman has not been paid; and

(3) the materialman had a good faith belief that the materials were intended for the specified work.

Martin Steel Constructors, Inc., 750 F.2d at 761 (citations omitted); *see United States for Use and Benefit of Pacific Equip. v. Fidelity and Deposit Co. of Md.,* 895 F.2d 546, 550 (9th Cir.1990); *Canion v. Randall & Blake,* 817 F.2d 1188, 1191 (5th Cir.1987); *ACC Roofing, Inc. v. Dix & Sons Constr. Co.,* 1991 WL 224066, *2 (E.D.Pa.1991); *Pittsburgh Builders Supply Co. v. Westmoreland Constr. Co.,* 702 F.Supp. 106, 108 (W.D.Pa. 1989).

■ We feel the record clearly demonstrates that Hussmann supplied materials to C. Pyramid for prosecution of work provided for under the Government Contract and that it had a good faith belief that the materials were intended for work specified under the Government Contract. Thus, the first and third elements have been met. It is the second element, whether payment has not been received, which we feel cannot be decided on summary judgment. We find that there is a genuine dispute of material fact over whether or not C. Pyramid has not paid Hussmann for sums "justly due [it]."

Section 270b(a) of the Miller Act provides: Every person who has furnished labor or material in the prosecution of the work provided for in such contract, in respect of which a payment bond is furnished under sections 270a to 270d of this title and who has not been paid in full thereof ..., shall have the right to sue on such payment bond for the amount, or the balance thereof, unpaid at the time of the institution of such suit and to prosecute said action to final execution and judgment for the sum or sums *justly due him* ....

40 U.S.C. § 270b(a) (emphasis added). "[T]he language of the Act permits a supplier [of materials] to recover, not the full contract price, but the sums justly due him." *United Structures of America, Inc. v. G.R.G. Eng'g,* 9 F.3d 996, 999 (1st Cir.1993). Thus, Hussmann may not bring a Miller Act claim against Fidelity & Deposit unless it shows that it is justly entitled to sums left outstanding under its Purchase Order with C. Pyramid. Here, Hussmann has alleged it is owed a total of $79,397. C. Pyramid has alleged that it is entitled to a recoupment of at least $ 81,239.54, the amount of backcharges DeCA levied against it, and potentially as much as $ 456,955.13, the total amount it alleges it has incurred as a result of Hussmann's breaches.

It is a fundamental tenet of suretyship that "the extent of the principal's liability measures the liability of the surety." 74 Am. Jur.2d Suretyship § 165 (citing *Allen v. Hartford Accid. Indem. Co.,* 123 P.2d 252, 190 Okla. 313 (citations omitted)). Accordingly, a surety may assert the same defenses to payment of a claim that the principal may assert. Here, Fidelity & Deposit asserts several defenses, all of which it claims entitle it to an offset against any claim Hussmann

may have against it on the payment bond. First, it asserts the defense that Hussmann has breached its contract with C. Pyramid. *See* Fidelity & Deposit Br. at 16 (citing *United States ex rel Soby v. Johnson,* 147 F.Supp. 523, 531 (D.Alaska 1957)). Second, it asserts the defense that the materials and services supplied (or lack thereof) were not in conformance with the Purchase Order. *See* Fidelity & Deposit Br. at 16 (citing *United States v. United States Fidelity & Guar. Co.,* 82 Vt. 103, 71 A. 1109, 1111 (Vt.1909)). Each of these defenses, it claims, entitle it to recoupment.

In *United Structures of America, Inc. v. G.R.G. Engineering,* 9 F.3d 996, 999 (1st Cir.1993), the court determined that a surety in a Miller Act case is entitled to make a claim of recoupment on behalf if its principal as a defense to a materialman's[4] claim against it on the payment bond. The court found that a general contractor could always assert defenses sounding in "set-off" or "recoupment" for materials that were delivered, but defective in nature. *Id.* The court also allowed a claim of recoupment for expenses that were incurred in curing defects. *Id.* According to the Court, the "[aim of recoupment,] doing justice in view of one transaction as a whole, ... would seem to match the [Miller Act's] requirement of determining the sums 'justly due' a supplier, making recoupment an appropriate defense in Miller Act cases ... [and] we do not see how the full contract price of goods supplied can possibly be 'justly due' a person who supplied defective goods ... [as] the policies underlying the Miller Act seem to permit recoupment." *Id.* The court concluded that the Miller Act's aim of protecting those whose labor and materials are used in federal government projects "does not include payments to which the supplier's underlying contract does not entitle him." *Id.*

We agree with the rationale of the *United Structures* court and hold that Fidelity & Deposit is entitled to raise a claim of recoupment as a defense to Hussmann's Miller Act claim. However, because we find that there are genuine disputed issues as to: 1) how

much money, if any, Hussmann is "justly due," 2) whether Hussmann breached the Purchase Order, 3) whether Fidelity & Deposit is entitled to any sums of recoupment on behalf of C. Pyramid, and 4) how much money, if any, Fidelity & Deposit is entitled to set-off against Hussmann's claim, we will deny both parties' motions for summary judgment and allow this case to proceed to trial.

## III. CONCLUSION

We hold that the supply of the O & M manuals provided by Hussmann on September 16, 1996 constitutes a delivery of the type of material which begins the running of the Miller Act one-year statute of limitations. Thus, Hussmann's May 12, 1997 Miller Act claim is timely. Although we find that Hussmann has satisfied three of the four elements necessary for succeeding on a Miller Act claim, we cannot, as a matter of law, determine whether it has met the element requiring non-payment of sums "justly due." We conclude that there is a genuine dispute as to whether or not Hussmann is "justly due" any sums from Fidelity & Deposit Accordingly, we will deny both parties' motions for summary judgment and allow this case to proceed to trial. An order will be entered accordingly.

---

4. The materialman in United Structures was the material supplier of a sub-contractor that was in privity of contract with the project's general contractor. The court allowed the surety to assert the defense of recoupment of its principal, the general contractor, against the material supplier of the sub-contractor.